**Robert LAMS and Robert Franklin, Appellants,**

v.

**GENERAL WATERWORKS CORPORATION, Appellee.**

**No. 84–1231.**

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 15, 1984.

Decided July 3, 1985.

As Modified on Denial of Rehearing and Rehearing En Banc Aug. 16, 1985.

---

Ronald L. Ellis, New York City, for appellants.

Spencer F. Robinson, Pine Bluff, Ark., for appellee.

Before BRIGHT, McMILLIAN, and BOWMAN, Circuit Judges.

BOWMAN, Circuit Judge.

Plaintiffs Robert Lams and Robert Franklin appeal from an order of the District Court, entered after a bench trial, dismissing their employment discrimination complaint against appellee General Waterworks. On appeal plaintiffs argue that the District Court clearly erred in its finding that they were not subjected to disparate treatment in promotional opportunities because of their race. We reverse and remand.

## I. Facts

### A. Overview of the Defendant's Operation

The defendant General Waterworks Corporation operates a number of waterworks for small and medium size cities across the country. The job promotions here at issue occurred during the summer and fall of 1979 at defendant's Pine Bluff, Arkansas facilities (hereinafter the Waterworks). At that time the Waterworks employed approximately 65 individuals. The Waterworks' work force is divided into several

classifications. The construction and maintenance (C & M) department is responsible for construction of new water mains and repair of existing water mains. The meter readers, as their name implies, read water meters throughout the system to monitor usage of water for billing purposes. The plant operators control the pumps which draw water from the Waterworks' wells. A plant operator's duties also include bacteriological testing of the water being produced by the plant,[1] addition of pre-packaged chemicals to the water, and upkeep of the plant area, including mowing grass and cleaning the reservoir and filters. Servicemen are responsible for connecting or disconnecting customers from water service. Servicemen also are charged with collecting overdue accounts and occasionally assist the meter readers in reading meters. The central office employees process payments, keep records, and are responsible for overall supervision of the plant. Generally, the C & M employees perform the most strenuous tasks including digging ditches, laying water mains, and occasionally moving furniture in the central office. The jobs held by the other employees involve considerably less heavy physical labor.

The facilities of the Waterworks include a central office, two water treatment plants, and the C & M area, all in Pine Bluff. The central office is located at 1100 State Street. It houses the clerical and administrative personnel and serves as a base of operations for the meter readers and servicemen. Plant # 1 is located at Fifth and Locust. Plant # 1 also houses the meter repair shop. Plant # 2 and the C & M division are located at Twenty-Ninth and Myrtle. Plant # 2 is an automated plant, which is controlled from Plant # 1. The three sites are each at least one and one-half miles from each other. There is little day-to-day contact between C & M employees and other employees of the Waterworks. The meter readers and servicemen have somewhat more contact with the office employees since they are all based at the central office.

The Waterworks' non-supervisory work force as of March 1979 included 35 persons, of whom 14 were black and 21 were white. The plant operations division employed five persons, four whites and one black. The black plant operator, Charles Earl, is the only black ever to have served in that capacity. The C & M division included eleven positions—four equipment operators, three utility I's (foremen) and four utility II's (laborers). All of these positions were filled by blacks in 1979. There were also four meter readers, one meter repairman, and three servicemen. All of these positions were filled by whites. The remainder of the non-supervisory personnel consisted of a white secretary, eight clerks (one of whom was black), a white storekeeper, and a black janitor. Although prior to 1979 some whites had served in C & M, no black served as a meter reader until September 2, 1980, almost a year after plaintiffs filed their initial Equal Employment Opportunity Commission (EEOC) complaint. Several white C & M employees have been promoted to jobs as meter readers, servicemen, or plant operators. Prior to 1979 only one black had been so promoted. At the time this appeal was argued, no black ever had served as a meter repairman or serviceman.

The educational requirements for all the foregoing positions were minimal, with few of the incumbents having high school diplomas. Even among the supervisors, high school diplomas were rare. The only special qualification for any of the positions was a state waterworks license. Since 1979, the State of Arkansas has required all plant operators to acquire a Class C waterworks license in order for a plant to retain state certification.[2] However, the

---

1. It is unclear how much bacteriological testing is now performed by plant operators. Loy Haddox, the supervisor of the plant operation, testified that samples are now sent to the state for analysis. Trial Transcript (Tr.) at 635.

2. Prior to 1979 only the plant superintendent and other supervisory personnel were required to be licensed. The Class C license is the lowest of three grades of state licenses. The supervi-

Waterworks did not require that a person seeking that position actually have such a license. Instead, new plant operators were given eighteen months in which to acquire a Class C license. The test for the license consisted of questions drawn from a set of study materials provided to applicants prior to taking the test. In addition to their on-the-job experience and independent study, all the incumbent plant operators received additional training at state-conducted seminars prior to taking the test.

Although some employees have been hired with prior experience, employees for all positions usually are trained on the job. All employees, including transferees from other departments at the Waterworks, must successfully complete a probationary period prior to acquiring permanent status in a particular position. This probationary period applies to Waterworks employees transferred from one job classification to another. A transferee's former position is not held open for him. Thus, if a transferee is found to be unsatisfactory in a new position, he may be terminated at the end of the probationary period.

The practical effect of this policy is to discourage inter-departmental promotions. Employees hired on a temporary basis in a department are generally the first to be promoted to permanent positions in that department when positions become available. This practice, along with the practice followed from 1972 until 1980 of not posting job openings, gave temporary employees within the department having an opening an advantage over permanent employees from other areas of the Waterworks in competing for the open position.

At the time of the events at issue here, an affirmative action plan was in effect for the Waterworks. This plan had been drafted by the national office of General Waterworks Corporation in 1973, and called for equal opportunity for minority applicants for all positions. Among other provisions, the plan stated that the Waterworks would post all jobs with a view toward increasing opportunities for minorities. As previously

mentioned, however, between 1972 and 1980 job openings were not posted, and recruitment was accomplished solely by word-of-mouth. As a general rule, jobs were filled by handpicked personnel, without consideration of other possible candidates.

### B. The Plaintiffs

Plaintiff Robert Franklin, a black male, started with the Waterworks on October 3, 1973 in the C & M department. In August 1978, Franklin was promoted to the position of equipment operator in C & M, a position which he still holds. Franklin testified that he first discussed his desire to work outside of C & M with Loy Haddox, the plant superintendent. Although the exact date of this conversation is unclear, it is certain that it occurred prior to Franklin's promotion to equipment operator, perhaps in 1977. Haddox told Franklin that he would have to get the permission of his supervisor, Leonard Garrison, in order to be transferred. Within a week of his discussion with Haddox, Franklin spoke to Garrison about receiving permission to transfer should an opening occur. According to Franklin's account, Garrision told him "[he] was needed mostly, you know, here, out in construction." Trial Transcript (Tr.) at 290.

Robert Lams, also a black male, was hired by the Waterworks as a temporary laborer in C & M in April 1978. He was promoted to a permanent position as a Utility II in C & M on August 27, 1978. Lams first discussed his interest in being promoted out of construction with Murray Reichen, the superintendent of the Waterworks. After that conversation, Lams' supervisor, Leonard Garrison, told Lams that he would have to have Garrison's permission to transfer out of the department.

### C. The Hiring Decisions in Question

The first of the decisions, which only Lams contests, occurred in June 1979. Shane Drye, a meter repairman, left his job

sors of the plant were required to have Class A licenses, which is the highest grade.

on two weeks notice. The position was filled by Thomas Holzhauer, a white. The position was not posted, Lams did not become aware of it until after it had been filled, and no one other than Holzhauer was considered. Holzhauer initially had been hired two months before as a temporary meter repairman. Holzhauer had no experience as a meter repairman prior to his association with the Waterworks. The Waterworks contends that it did not have the time to seek and train another person, such as Lams, because it was carrying out a state directive to conduct a recalibration and check-out of all 8,400 water meters in its system at the time of Drye's departure. According to Reichen's testimony, this constituted an emergency which precluded the Waterworks from considering a person untrained in meter repair. During his two months of work with Drye, Holzhauer had apparently learned enough to perform the meter repairman's job.

The second decision, which both plaintiffs contest, was the promotion of Joey Lybrand, a white male, to the position of plant operator. The position became open in August 1979, when Plant Operator Billy Mills, the incumbent, gave notice that he would be resigning his position in two weeks. The job was not posted, and neither plaintiff became aware of it until after it had been filled. The plant superintendent, Loy Haddox, recommended that Lybrand be promoted to the position. Lybrand had been working for the Waterworks in C & M for about two months at the time of his promotion. In explaining the decision, Garrison, Haddox, and Reichen all testified that Lybrand was a good employee with a good attendance record. Another asserted basis for the decision was the fact that Lybrand had taken a high school chemistry course.

Despite having articulated a desire to be promoted out of C & M, neither of the plaintiffs was made aware of either job opening before it was filled. Plaintiffs' testified that their desire for advancement was not because of a desire for higher pay; rather, they wished to do less strenuous work. Their C & M positions involve considerably more manual labor than the meter repair or plant operator positions.

Several other job openings occurred after the two contested positions were filled. At first, consistent with prior practice, none of these positions was posted. In 1980, however, for the first time since 1972, the Waterworks began posting job openings again, but included possession of a high school diploma as a new requirement for all positions. This was reduced to a preference for a high school education in 1981, and later was eliminated. Since that time, the Waterworks has hired two black meter readers. There have never been any black meter repairmen or servicemen, and there has been only one black plant operator.

Plaintiffs filed charges with the EEOC on September 15, 1979. The EEOC issued a Right to Sue letter in December 1980, and the plaintiffs filed suit on February 17, 1981, under 42 U.S.C. § 1981 and 42 U.S.C. § 2000e. Trial was held on January 10 and 11, 1984. The District Court issued its decision on January 13, 1984.

## II.  The District Court's Decision

The District Court found that plaintiffs had made out a prima facie case of discrimination, but that the Waterworks had articulated legitimate, nondiscriminatory, nonpretextual reasons for its hiring decisions. The Court accepted the Waterworks' explanations for its hiring decisions, crediting Reichen's testimony that, with respect to the meter repair position, he was facing an emergency situation, and with respect to the plant operator's position, Lybrand was better qualified than either Lams or Franklin. The Court found it significant that the C & M department had from time to time employed whites, yet there is no indication in the opinion that the Court considered the virtual absence of blacks from other departments as relevant to the case.

Although the Court was troubled by the subjectivity of the Waterworks' hiring and promotional practices, it noted that since the filing of the EEOC charges and the commencement of this litigation, the Wa-

terworks had implemented changes which removed some of the subjectivity from the hiring and promotional process. These changes included the posting of all nonsupervisory job openings and the preparation of written job descriptions for some positions. The Court also noted that all of the jobs, including those in C & M, offered "dignified working conditions" and were not menial or demeaning. Along with this, the Court pointed out that the starting pay for the meter repair and plant operator positions was lower than the current hourly rate plaintiffs were making at the time of the trial.

The District Court concluded that plaintiffs had made out a prima facie case of discrimination under the standards set forth in *McDonnell-Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The District Court then proceeded to analyze the Waterworks' promotional procedures and decisions as if they had occurred in the context of a classic *McDonnell-Douglas* factual setting in which plaintiffs were 1) members of a racial minority, who 2) applied for positions for which they were qualified, 3) were rejected for the positions, and thereafter 4) the positions remained open and the employer continued seeking applicants. Having determined that a prima facie case had been established, the Court analyzed the Waterworks' articulated nondiscriminatory reasons for its failure to hire the plaintiffs. The Court, viewing this evidence in light of the plaintiffs' assertions of pretext, found no pretext.

### III. Discussion

We believe that, by treating the case as if it presented a classic *McDonnell-Douglas* fact pattern, the District Court committed an error of law. As the Supreme Court specifically noted in *McDonnell-Douglas*, "[t]he facts necessarily will vary in Title VII cases, and [this four-part test] is not necessarily applicable in every respect to differing factual situations." *Id.* 411 U.S.

at 802 n. 13, 93 S.Ct. at 1824 n. 13. The Supreme Court later reiterated this sentiment, noting that the four-part test "was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *Furnco Construction v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978). Clearly the Supreme Court has recognized the need for flexibility in application of the *McDonnell-Douglas* guidelines to differing factual situations. In the present case, the evidence distinctly shows that plaintiffs never were actually considered for the positions in dispute, and thus were not compared with the successful candidates. Consequently, the four-part *McDonnell-Douglas* formula is of little use in deciding this case.

As has frequently been stated in racial discrimination cases "statistics often tell much and Courts listen." *State of Alabama v. United States*, 304 F.2d 583, 586 (5th Cir.) *aff'd* 371 U.S. 37, 83 S.Ct. 145, 9 L.Ed.2d 112 (1962). This Circuit has held that the maintenance of a segregated work force will raise an inference of discrimination. *United States v. N.L. Industries, Inc.*, 479 F.2d 354, 370 (8th Cir.1973). The evidence in this case shows that the Waterworks' black employees were heavily concentrated in C & M. At the time of the hiring decisions in dispute, except for one clerk and one janitor, there was only one black employed in any of the nonsupervisory job classifications outside of C & M. This alone was sufficient to raise an inference of discrimination in promotions and hiring for those job classifications. *See Parham v. Southwestern Bell Telephone Co.*, 433 F.2d 421, 426 (8th Cir.1970).

Other evidence introduced at trial reveals that the Waterworks engaged in systematic discrimination against blacks with respect to promotions. Although the Waterworks' supervisors expressed their opinion that through their policy of word-of-mouth recruitment "everyone knew" of job opportunities as they occurred, three C & M

employees testified that they knew nothing of openings outside of their own department. Sylvester Washington's testimony is illustrative:

Q. Okay. When did you first become interested in promotions, if you ever became interested in them?

A. Well, after Danny Lunsford became a meter reader and I started inquiring into, you know, how he got it, and didn't nobody know. And they didn't have no bids or anything or to bid on the job. And so that was it.

Q. Who did you ask?

A. I didn't ask anyone at the time because didn't none of the employees know.

Q. How he got the job?

A. Uh-huh. He just—

Q. Go ahead.

A. They just called him in the office and, the next thing you know, they're gone.

Tr. at 389. Reliance on such word-of-mouth recruitment, especially in a segregated work force, easily may result in discriminatory personnel decisions. *Reed v. Arlington Hotel Company, Inc.,* 476 F.2d 721, 724 (8th Cir.1973). Here the problem was exacerbated by the physical separation of the C & M area from the other departments at the Waterworks. Moreover, the work routine of C & M employees seldom brought them in contact with other departments of the Waterworks. C & M employees spend the bulk of their time in the field. Thus, the failure to post jobs clearly hindered black C & M employees in their quest for advancement since these employees were generally unaware of job openings before they were filled.

Black C & M employees also had to overcome the discouraging attitude of C & M department head Leonard Garrison. Typically, his response to inquiries by blacks regarding promotion was similar to the one he gave Plaintiff Franklin—that he "was needed mostly ... out in construction ...". Tr. at 290. Lams received no more encouragement. After Lams talked to Reichen regarding promotions, Garrison told Lams that no one could be promoted from C & M without his consent. Tr. at 184. When asked why virtually all the blacks in the Waterworks were concentrated in his department, Garrison gave the following response:

A. I would presume that's the type of work that they like.

Q. Okay. You presume that's the type work black folks like—hard laborious work?

A. The majority of them that comes there has already worked in construction. And I just presume he figures he's got a pretty good chance of getting on and having a job.

Tr. at 717. Garrison apparently made no similar presumption regarding white employees in his department, since there are at least three instances of whites being promoted out of C & M.[3] Garrison's apparent attitude toward blacks, coupled with his rebuffs to those who inquired about promotions, effectively foreclosed black C & M employees from competing for promotional opportunities.

■ Reichen relied heavily on Garrison's subjective evaluation of candidates for promotion from C & M in reaching his decisions. Denial or limitation of promotional opportunities to a protected class on the basis of an employer's belief that members of that class are not interested in being promoted is a discriminatory practice. *See Carmichael v. Birmingham Saw Works,* 738 F.2d 1126, 1134 (11th Cir.1984) (employer's assumption that black plaintiff was not interested in promotion to sales position where there had been only one black salesman in employer's history raised possibility that employer assumed all blacks were uninterested in sales positions). Here a belief on Garrison's part that black C & M employees were not interested in being pro-

---

**3.** Danny Lunsford was promoted from Utility II in C & M to Meter Reader on January 29, 1978. Plaintiff's Exh. 37 at 8. Shane Drye was promoted from Utility II in C & M to Meter Repairman on April 9, 1978. Plaintiff's Exh. 40 at 2. Joey Lybrand was promoted from Temporary Utility II in C & M to Plant Operator on August 5, 1979. Plaintiff's Exh. 34 at 4.

moted to other jobs was established through direct testimony.

Although plaintiffs had made known their interest in being promoted to positions outside of C & M, they did not aggressively pursue promotional opportunities because, as a result of Garrison's rebuffs and Reichen and Haddox's failure to follow through on their inquiries, they apparently believed that to do so would be futile. The Supreme Court, in *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), easily could have had the Waterworks in mind when it stated:

> If an employer should announce his policy of discrimination by a sign reading "Whites Only" on the hiring-office door, his victims would not be limited to the few who ignored the sign and subjected themselves to personal rebuffs. The same message can be communicated to potential applicants more subtly but just as clearly by an employer's actual practices—by his consistent discriminatory treatment of actual applicants, by the manner in which he publicizes vacancies, his recruitment techniques, his responses to casual or tentative inquiries, and even by the racial or ethnic composition of that part of his work force from which he has discriminatorily excluded members of minority groups. When a person's desire for a job is not translated into a formal application solely because of his unwillingness to engage in a futile gesture he is ... a victim of discrimination....

*Id.* at 365–66, 97 S.Ct. at 1870 (footnote omitted). In light of the fact that plaintiffs were deterred from applying—and indeed were precluded from applying—for available promotions, the District Court's focus on the reasons the Waterworks gave at trial for preferring its handpicked candidates over plaintiffs is misplaced. The Waterworks' *post hoc* comparisons between the employees who were promoted and plaintiffs fail to explain why plaintiffs were not interviewed or considered for the positions, especially in light of the Waterworks' concession that both plaintiffs were qualified for the positions sought. *Cf. Nanty v. Barrows Co.,* 660 F.2d 1327, 1332 (9th Cir. 1981) (where defendant summarily rejected plaintiff prior to learning of his qualifications for position, defendant's assertion of plaintiff's lack of qualifications does not constitute rebuttal of plaintiff's prima facie case).

■ This Circuit has held that a near-total absence of blacks from all but the lowest levels of an employer's work force may, by itself, constitute a Title VII violation. *See Parham,* 433 F.2d at 426. Whether such absence is the result of an employer's failure even to consider blacks for promotion or the result of the rejection of blacks for pretextual reasons following token consideration, the Title VII violation is equally established.

At trial the Waterworks went to great lengths to demonstrate that the revamping of its personnel practices carried out after the plaintiffs filed their EEOC charges had eliminated any potential for future discrimination. These improvements include the posting of jobs, which began in March 1980, about seven months after the filing of the EEOC charges in this case. Until December 1980, however, the postings listed "high school graduate" as a requirement. Reichen testified that this was intended only to ensure that potential applicants were literate, and not to exclude non-high school graduates. After December 1980 this requirement was changed to a preference for high school graduates and in 1982 was dropped entirely.

These changes, however commendable they may be, cannot change history. Subsequent changes by the Waterworks may be relevant in determining the appropriate remedy in this case, but they cannot absolve the Waterworks from liability under Title VII for its previous discriminatory actions. *Parham v. Southwestern Bell Telephone Co.,* 433 F.2d 421, 426 (8th Cir. 1970).

**IV. Conclusion**

■ The black employees in the Waterworks' work force were concentrated al-

most exclusively in the C & M department. C & M is located at least one and one-half miles from the nearest staffed facility of the Waterworks. Jobs were not posted between 1972 and 1980 and C & M employees have little contact with other employees. Thus, C & M employees had little opportunity to learn of job openings until they had been filled.

The record reveals that the promotional fortunes of black employees rested on the views of C & M supervisor Garrison, since plant superintendent Reichen relied heavily on Garrison's recommendations in determining whether to promote C & M employees. Indeed, black employees were told that they needed Garrison's approval in order to transfer out of C & M. Yet, whenever black C & M employees asked Garrison about promotional opportunities outside of C & M, their inquiries were rebuffed or ignored. The record does not indicate any particularized need for keeping in construction blacks who had asked about promotional opportunities other than Garrison's view that blacks preferred to do that kind of work.

The Waterworks records in evidence reveal that until 1980 there had never been a black meter reader. At the time of trial there had never been a black meter repairman or serviceman. The records show only one instance of a black being promoted out of C & M prior to 1980. This promotion occurred in 1973. During 1978 and 1979, at least three whites were so promoted; the record shows that the blacks who had expressed an interest in promotion were simply not considered for the promotions, despite the Waterwork's later admission that they were qualified. This maintenance of a largely segregated work force, by an all-white supervisory staff which ignored or discouraged black employees' efforts to seek promotions into all-white or predominantly white job classifications, constitutes a clear violation of Title VII.

Having carefully reviewed the record, we conclude that the District Court's finding of no employment discrimination against plaintiffs on the basis of race is clearly erroneous and is based on improper legal standards. We further hold that plaintiffs have established Title VII liability on the part of the Waterworks for its failure to consider plaintiffs in 1979 for the positions of meter repairman and plant operator. We reverse and remand the case to the District Court for consideration and determination of the remedial aspects of the case.