**Esther HARRIS, Plaintiff,**

v.

**WAL–MART, Defendant.**

**No. LR–C–85–0229.**

United States District Court,
E.D. Arkansas, W.D.

March 4, 1987.

Richard Quiggle, Quiggle and Thompson, Little Rock, Ark., for plaintiff.

Scotty Shively, Hatfield, Robinson, Hodges, Staley, Marshall, Jordan & Shively, Little Rock, Ark., for defendant.

## MEMORANDUM OPINION

ROY, District Judge.

Trial was held before the Court in this matter on June 23 and 24, 1986 and September 17 and 18, 1986. Post-trial briefs and reply briefs have been received and the Court makes the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

1. Plaintiff Esther Harris, a black female, was hired at Wal-Mart Store No. 124 on June 28, 1977.[1] Sometime in September of 1977, she began working as a checker/cashier.

2. Defendant Wal-Mart Stores, Inc. is an Arkansas corporation engaged in the business of operating retail discount stores.

3. Wal-Mart Store No. 124 is located at 8717 Geyer Springs Road, Little Rock, Arkansas.

4. On or about January 1, 1981 plaintiff was moved to the position of Checkout Supervisor (COS). The title of this position was later changed to Customer Service Manager (CSM). The CSM trains, directs, and assists the checkers, and schedules all breaks and lunches for checkers. The CSM is responsible for approving checks, overings, refunds, and voids, for distributing money to each register, for picking up money from the registers, and for all change needs of the registers.

5. Jim Harris was assigned as Store Manager of Wal-Mart Store No. 124 in June, 1981 and remained there until January, 1984. At the time Jim Harris was assigned to the store, the store had had a history of high cash shortages and he was made aware that there was a problem with cash control problems on the checkout lanes.

6. On November 6, 1981, Jim Harris gave plaintiff a written counseling, stating that plaintiff was not doing a good job as service manager for the following reasons:

A. Cash shortages are still abnormally high—no reason for this—and no excuse.

B. Poor morale of checkers who feel they are being picked on.

C. Poor scheduling of breaks and lunches. Several complaints here.

---

**1.** In plaintiff's post-trial brief, plaintiff stated that she was first employed as a marker, or stockperson.

This evaluation of Esther's performance necessitates disciplinary action of a 30–day probation.

7. On November 10, 1981, plaintiff filed a charge of discrimination with the EEOC, claiming that she was placed on probation because of her race.

8. Thirty days later, on December 10, 1981, plaintiff was re-evaluated, and Jim Harris noted her improvement. Plaintiff received a $.30 an hour raise at this time.

9. On February 3, 1982 plaintiff received a semi-annual evaluation at which time Jim Harris noted that she was doing "a much better job at the front." Plaintiff received a $.20 an hour raise at this time.

10. On April 19, 1982, plaintiff received a written counseling for a $100.00 shortage. Pam Bedford, a black female, who was the relief checkout supervisor that day, and Laverne Hartwick, a white female, who was the night checkout supervisor, also received warnings.

11. Because the cash shortages at Store 124 continued, Wal-Mart Loss Prevention Supervisor Ken Ruck, who was responsible for the security of ten stores in the central Arkansas area, was called in to investigate the shortages in 1982. He was notified by the store manager that excessive cash shortages were being experienced in the checkout area. He began investigating to find out whether it was carelessness, mishandling of money, or theft. At this same time, there was a changeout of cash registers. The only problems experienced with the new registers were with the batteries, and the registers would lock up when these problems arose. This could cause a lane to close, but not a cash shortage. In fact, if a register was to completely go down and lose its total memory, the money that was in the register would be counted at that point in time and would be reported as exactly even and not over or short, because there was no basis to find out what the actual register asked for in change. If the memory was lost, they had to take for granted what cash was in the drawer, so the register would be shown as even.

12. Mr. Ruck, in conducting the investigation, first had members of management perform audits after 5:00 p.m. to determine whether the shortages had already occurred before 5:00 p.m. These audits showed that the cash registers were more prevalently short already at 5:00 p.m. Further investigation revealed that there was no specific checker that was responsible for the shortages. The investigation then focused on the CSM. A closed circuit TV video camera was installed to record the activities of the checkout area. This revealed instances of policy violations on the part of plaintiff. In one instance, plaintiff took what was apparently a large bill from a register bag and placed it in her smock pocket. It was a violation of Wal-Mart policy for plaintiff to place money in her pocket. Although Mr. Ruck did not feel that the videotape was substantial enough for purposes of discharge or prosecution as far as the denomination of the bill and exactly what happened to the bill after plaintiff left the area, he and management did feel that further investigation was needed. Therefore, an excess amount of money in the amount of $16.00 was placed in an opening bag for the next morning to determine whether plaintiff would report the overage. The proper procedure was to report the overage immediately. Plaintiff did in fact turn in the overage, but waited until the end of the day to do so.

13. Plaintiff contended that on the day of the $16.00 overage it was extremely hectic and she kept the $16.00 in her pocket because the store had switched registers and she had no trained checkers.

14. Subsequent to the investigation, Mr. Ruck spoke with plaintiff, asking for an explanation of the policy violations. He also had compiled evidence indicating shortages were more prevalent and greater when plaintiff was working than when she was on vacation. After their discussion, Mr. Ruck recommended that plaintiff be reassigned to another area of the store. Once reassigned, the cash shortages did not stop but they decreased considerably.

15. For the six months preceding plaintiff's transfer, the net amount of cash

shortages was $1,718.56; during the six months following plaintiff's transfer, there was a net overage of $88.68.

16. Another CSM who was white and worked at night was terminated after being seen on videotape taking a pack of cigarettes and putting them in his pocket.

17. Testimony indicated that the company policy was and is that no company money is allowed to be put on a person, in pockets or anywhere. An employee is only allowed to have change in their smock pocket or jeans pocket for Cokes or snacks.

18. On July 2, 1982, Jim Harris wrote his counseling report that resulted in plaintiff's removal from her CSM position.

19. When plaintiff was removed from her position as CSM, she was offered a position in the receiving department where she would not have cash handling responsibilities and where she could be under closer supervision. The reassignment to the receiving department did not result in a cut in either salary or the number of hours scheduled.

20. White employees have also been transferred to a different job within Wal-Mart for their inability to handle a job or for poor performance in a particular job. In addition, a number of other blacks received favorable treatment and advanced under Jim Harris' supervision.

21. Plaintiff was replaced as CSM by Earl Blood, a white employee, who had worked under District Manager Bill Evans at Wal-Mart Store No. 126 located on West Markham in Little Rock as a department manager and CSM. Blood had gained experience on the NCR registers at Store No. 126 and helped with the training at that store. Blood had quit his job at Store No. 126 and had been hired as a part-time employee at the Geyer Springs store on June 3, 1982 as a candidate for the Management Training Program. Prior to plaintiff's transfer from CSM, Blood was backup to the night CSM, Laverne Hartwick, and had helped with the training of checkers on the new NCR register system which would be installed at Store No. 124. When the CSM position became available, Blood was the obvious choice because of his experience at the West Markham store and because he was already relieving at night as CSM. However, he had a full-time job somewhere else and Wal-Mart had to offer him a salary of $5.15 per hour to induce him to leave his full-time job and come to work full-time for Wal-Mart as day CSM. Evans also knew that Blood had experience from the West Markham store in operating "scanner" registers and that this experience would be needed when the scanner operation would come on line in Store No. 124 in several months. Although Wal-Mart issues salary guidelines which are recommended minimums for each position, personnel gives management the flexibility to pay an employee for his or her experience when necessary.

22. At the time plaintiff was CSM, there were seven register lanes at the front. After the remodel, there were 15 registers at the front and four registers at the side.

23. Plaintiff was making $5.00 per hour at the time of her transfer from CSM to the receiving department. The night checkout supervisor, Laverne Hartwick, was making $4.95 per hour at that time. Hartwick had more overall tenure with Wal-Mart and more tenure as CSM. Plaintiff received periodic raises while in the receiving department. The average hourly rate of all associates (employees) in the receiving department who appear on the 1982 year-end paymaster was $3.95 per hour; in 1983 the average hourly rate of those employees was $4.20. Plaintiff's average hourly rate in 1982 was $5.15 per hour and $5.55 in 1983. In 1984, the average hourly rate of employees in the receiving department was $4.08 and Plaintiff's hourly rate was $5.70. In 1985, the average hourly rate for all employees in receiving was $4.25 and Plaintiff's average hourly rate was $5.90.

On December 31, 1982, plaintiff's hourly rate was $5.15 per hour and the average rate of all hourly employees with more seniority was $5.04 per hour. On December 31, 1983 plaintiff's rate was $5.55 per hour and the average rate of hourly employees with more seniority was $5.43. On

December 31, 1984, plaintiff's rate of pay was $5.70 compared to an average rate of $5.65 for hourly employees with more seniority. On December 31, 1985, plaintiff's hourly rate was $5.90 compared with the average rate of $5.95.

24. Plaintiff's preference for working day shifts was accommodated when she was transferred to the receiving department. She did not volunteer to work at night when there was extra work or when an area was behind on its work. She was not required to work the flexible receiving schedule which required employees to be available when the trucks came in. Plaintiff was not penalized for her inability to volunteer for overtime projects or for not being available for the flexible receiving schedule or night work.

25. There was testimony from people who either directly supervised or worked with plaintiff while she was in the receiving department that plaintiff did not display attributes which would qualify her for promotions to more responsible or demanding jobs. She was frequently behind in her work, and made some costly errors, one of which resulted in a counseling warning.

26. There was testimony from an assistant manager that plaintiff was argumentative towards making any changes or helping in other areas. When she was asked to work in other areas, she always had an excuse as to why she could not, why it was someone else's area or duty, or that she was not required to do that. She also did not want to check her merchandise in first-in/first-out but rather would price the quickest and easiest items first and leave the more time-consuming items until later.

27. Plaintiff never indicated in the spaces designated on her evaluations that she was interested in a position to department manager or assistant manager. She did request a transfer to an office position at the time of her evaluation on July 6, 1984 and again on September 5, 1985. Plaintiff met with William Huffman, an assistant manager, and Store Manager John Masterpole with regard to the UPC (Uniform Price Code) clerk position. The UPC clerk is responsible for entering items into the computer file so that these items can be priced correctly and so that the right price will be scanned. This was a new office position which was created after Store No. 124 began scanning operations. A number of employees had expressed an interest in this job and Store Manager Jim Harris selected Bobbie Huskey, a black female, for the position. When Huskey transferred to a Wal-Mart store in Oklahoma City, Joan Wimberly, a white female, received the position. Wimberly had already obtained experience in operating the UPC computer when she volunteered for work on the night crews in the receiving department and as a result of this experience was already "back up" to UPC clerk.

28. Plaintiff had no office experience either at Wal-Mart or elsewhere. Further, she did not demonstrate that she was performing her job in the receiving department at a level which would have entitled her to a transfer to an office position.

29. Plaintiff's replacement, Donna Richardson, is working the same number of hours that plaintiff worked and is able to keep the area caught up daily when she leaves. She also helps unload trucks and helps out in other areas in receiving when she is caught up.

30. Although the plaintiff testified that her workloads both as checkout supervisor and receiving department clerk were unreasonably demanding of her time and disproportionately unfair, she did manage to find the time during her work hours to average writing and cashing three to four personal checks daily at Wal-Mart for cash totaling $200 to $300 and to make three to four deposits daily to her personal bank account of similar sums of money. Some of the deposits were made at a nearby bank branch of Union National Bank and some were made by the plaintiff at the downtown main bank. The plaintiff made all deposits in person, and most were made during work hours. The deposits made downtown were driven by plaintiff from the defendant's Geyer Springs store in southwest Little Rock to the main bank in downtown Little Rock during plaintiff's work hours. Such behavior and activity by

the plaintiff is relevant to: (1) whether plaintiff was giving 100% attention to her job; (2) whether plaintiff's workload was unreasonably demanding of her time or whether plaintiff's personal check-writing activity was so time consuming that she could not catch up her work; (3) whether the checking account activity caused plaintiff's alleged distress and alleged high blood pressure rather than the ordinary pressures of her job as a receiving clerk at Wal-Mart; and (4) whether plaintiff was competent and trustworthy to handle cash as a CSM or cash office clerk for Wal-Mart.

31. Plaintiff started writing a large number of checks to Wal-Mart and her financial matters began unraveling prior to 1985 when her whole life started to fall apart. Not only was plaintiff kiting checks on Wal-Mart's time using Wal-Mart's money and using various other Wal-Mart associates' time in cashing plaintiff's daily checks and keeping sufficient cash on hand for plaintiff's convenience, plaintiff's checks to Wal-Mart were bouncing frequently and regularly over an extended period of time until it got to the point on October 18, 1985, that seven (7) of plaintiff's personal checks totaling $790.00 written to Wal-Mart and cashed at Wal-Mart were returned for insufficient funds that day. According to a written incident report dated October 18, 1985, signed by plaintiff, during the period September 10, 1985 through October 8, 1985, fourteen (14) of plaintiff's checks totaling $985.00 had been returned to defendant dishonored for insufficient funds. Defendant counseled and reprimanded plaintiff for this conduct on October 18, 1985, but defendant did not terminate or even demote plaintiff.

32. During the month ending October 8, 1985, plaintiff wrote over 100 checks totaling $7,849.60 and made 45 deposits totaling $7,484.29 in her personal bank account. All of those checks written by plaintiff were written to and cashed by Wal-Mart in the Geyer Springs store except for four (4) checks totaling $192.25. All of the deposits were cash deposits except four (4) in which checks totaling $779.29 were deposited. Yet plaintiff's take-home pay from Wal-Mart and from her life insurance sales job

was less than $1,000 per month. During the first ten (10) months of 1985 plaintiff deposited $38,534.87 in her personal bank account utilizing 220 separate deposits. During that same period she wrote 678 checks on that same account for $38,596.33.

33. On January 24, 1986 plaintiff resigned from her employment at Wal-Mart. She informed Assistant Manager Richard Richard Winfrey that the reason for her resignation was to accept another job with National Western Life Insurance Company where she had worked part time for one year prior to quitting her job at Wal-Mart. Plaintiff did not indicate that her resignation was related to any mistreatment from Winfrey in particular or from Wal-Mart in general.

34. Wal-Mart maintains an Employee Profit Sharing Plan to provide retirement funds for its associates. The Plan is totally funded by the Company which makes contributions to this Plan on behalf of its employees. Employees are fully vested in the Plan after seven years. An employee is not eligible to receive any distribution from the Plan prior to his or her termination from employment at Wal-Mart. At the time of plaintiff's resignation, she was 100% vested in the Plan and has subsequently received the entire amount contribution which had been made on her behalf, a gross amount of $15,046.20; the net amount after taxes were withheld was $14,293.89.

35. Plaintiff was not transferred from her position as checkout supervisor to receiving department because of her race.

36. Plaintiff was not denied a promotion to department manager or assistant manager because of her race.

37. Plaintiff was not denied transfer to an office position because of her race.

38. Plaintiff was not constructively discharged because of her race.

39. There was no disparate treatment with regard to written counselings received by plaintiff.

40. Wal-Mart did not discriminate, intentionally or otherwise, against plaintiff

because of her race in any of its employment practices or policies.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction under 28 U.S.C. §§ 1343(3) and (4), 2201, and 2202 and 42 U.S.C. § 1981.

2. Plaintiff's claims under 42 U.S.C. § 2000e et seq. have been dismissed.

3. Plaintiff alleges she was discriminated against by the defendant on the basis of her race by transferring her to the receiving department, and failing to promote her. She also asserts the claim of constructive discharge against the defendant.

4. With respect to the demotion claim, in order to prevail on this allegation, plaintiff must first establish a *prima facie* case. Defendant states that to meet this burden plaintiff must show:

   (1) that she is a member of a protected class;

   (2) that she was performing her job in a satisfactory manner;

   (3) that she was demoted; and

   (4) that she was replaced by a person not in her protected group.

Plaintiff states that direct evidence of race discrimination is present and that this suffices to establish the plaintiff's *prima facie* case, citing *Williams v. TransWorld Airlines, Inc.*, 660 F.2d 1267 (8th Cir.1981).

In *Baron v. Volusia County*, 36 F.E.P. Cases 1872 (M.D.Fla.1984) [Available on WESTLAW, DCTU database], the Court held that in a case alleging disparate treatment in demotion, a plaintiff must show that:

   (1) plaintiff is a member of a protected class;

   (2) plaintiff was in fact demoted and singled out for adverse treatment; and

   (3) plaintiff was treated differently by defendant than others who were similarly situated but not of the protected class.

*Id.* at 1874.

■ 5. Under any of the above tests, plaintiff has failed to meet her burden. There is no evidence that the reason for removing plaintiff from the CSM position was prompted by her race. The reasons for cash shortages and plaintiff's performance were fully investigated prior to plaintiff's removal from CSM. This investigation was then carefully scrutinized and rather than discharging plaintiff, Wal-Mart took the less drastic measure of transferring plaintiff. The facts above reflect that plaintiff was not singled out or treated differently than others similarly situated, and she received no cut in pay.

6. With respect to the promotion claim, plaintiff cites *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) for the proposition that the prima facie proof required in *McDonnell* is not necessarily applicable in every respect to differing factual situations. It is contended that the case of *Texas Dept. of Community Affairs v. Burdine*, 459 U.S. 248, 103 S.Ct. 608, 74 L.Ed.2d 430 (1981) allows that the prima facie case may be established by plaintiff showing different treatment "under circumstances giv[ing] rise to an inference of unlawful discrimination." This test was applied in *Lams v. General Waterworks Corp.*, 766 F.2d 386 (8th Cir.1985). The facts in *Lams* are easily distinguishable. *Lams* was brought under Title VII rather than 42 U.S.C. § 1981. Although the Court does not enunciate whether its finding of liability in *Lams* rests on a disparate treatment or disparate impact theory, it can be argued that the case fits within the disparate impact theory. Rather than finding liability on the basis of how the two black plaintiffs were treated in comparison to white employees, the Court appeared to find liability on the basis of a promotional system which impacted disproportionately and discriminatorily against blacks. To the extent that *Lams* is based upon the disparate impact theory, it has absolutely no application in a Section 1981 case. *See, General Building Contractors Association v. Pennsylvania*, 458 U.S. 375, 383, n. 8, 102 S.Ct. 3141, 3146, n. 8, 73 L.Ed.2d 835 (1982); *Marshall v. Kirkland*, 602 F.2d 1282, 1298–99 (8th Cir.1979). Wal-Mart Store No. 124 is one single facility where all employees had access to one another

and to management. The defendant in *Lams* maintained three separate sites which were at least one and a half miles from each other. In contrast to the facts in *Lams*, Wal-Mart's practice with regard to promotions did not discourage black employees from requesting, being recommended, or actually receiving promotions. Plaintiff's own case is a perfect example of this distinction. Plaintiff was obviously considered and given a promotion at one time to the CSM position. There were two black employees, Lea Russ and Bobbie Huskey, who received promotions to office positions which plaintiff wanted. Plaintiff's department manager in the receiving department at one time was a black employee and other black employees were assigned to the CSM and department manager positions. *Lams* has been held to be not applicable in a case when the plaintiffs never demonstrate that they were qualified for the jobs for which they claimed they should have been considered. *Longworth v. National Supermarkets, Inc.*, 41 FEP Cases 30, 37 (E.D.Mo.1986) [Available on WESTLAW, DCTU database].

Both plaintiffs claim that National disciplined them more severely than similarly situated checkers who were either male or younger. However, National demonstrated at trial that if [sic] often disciplined younger male checkers who made mistakes. Further, no checker ever made as many mistakes as plaintiff Longworth. Although it is not clear exactly what McDonnell Douglas required the plaintiffs to prove to establish their prima facie case on this point, defendant National met its burden under Burdine by giving convincing reasons for the disciplinary actions it took. The plaintiffs offered no evidence sufficient to establish that these proffered reasons were pretextual.

Both plaintiffs also claim that National should have considered them for various department head and management positions; however, the plaintiffs consistently professed satisfaction with their positions as checkers in National's yearly employee survey, and never expressed any interest in management positions.

As non-applicants, plaintiffs must show that National deterred them from applying for the management positions, *International Brotherhood of Teamsters v. U.S.*, 431 U.S. 324, 265–71 [ (365–71) 97 S.Ct. 1843, 1869–73, 52 L.Ed.2d 396], 14 FEP Cases 1514—(1977), an issue on which they produced no credible evidence.

The situation here differs from that in *Lams v. General Waterworks Corp.*, 766 F.2d 386, 38 FEP Cases 516 (8th Cir. 1985). There, the Eighth Circuit refused to apply the McDonnell Douglas analysis since statistical evidence demonstrated that the employer relegated a protected group to certain menial job categories, and filled vacancies in better jobs through a word of mouth process. *Id.* at 391–93. But, unlike the claimants in *Lams*, plaintiffs Unverferth and Longworth never demonstrated that they were qualified for the jobs for which they claim National should have considered them. The Court cannot analyze the plaintiffs' vague assertions that they could have performed well in unspecified management or supervisory positions if the company had trained them. *Id.*, 41 FEP cases at 37.

7. Although the Court does not necessarily approve of the "word of mouth" promotion system, the Court does not find the promotion systems discriminated against plaintiff.

8. In finding that *Lams* is not applicable, the Court must then apply the appropriate *McDonnell Douglas/Burdine* analysis in order to prevail on her promotion claims. Under said analysis, plaintiff must first establish a *prima facie* case consisting of the following elements:

(1) that she was a member of a protected class;

(2) that there was a vacancy for a position;

(3) that she was qualified for the position; and

(4) that the person chosen for the position was not a member of plaintiff's protected class.

9. Plaintiff has alleged that she was denied promotions which white employees with less experience received. The only evidence presented by plaintiff on this allegation was a promotion log which listed forty employees and a job title. In some cases the names were incomplete and in some cases the job title was not an actual position which Wal-Mart maintained. Plaintiff presented absolutely no testimony as to the duties involved in the job, the date the employee received the promotion, her qualifications for the job, or the relative qualifications of the employee who received the job. The only qualifications which plaintiff asserted were her longevity with Wal-Mart and the fact that she could be trained to do the job.

10. Assuming that plaintiff has established elements 1, 2, and 4 above, she must also show that her qualifications were equal to or greater than the one selected. An employer can legitimately choose among equally qualified candidates so long as the decision is not based upon unlawful criteria. *Goldman v. Marsh*, 31 EPD ¶ 33605 (E.D.Ark.1983) [Available on WESTLAW, DCT database], citing *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 103 S.Ct. 608, 74 L.Ed.2d 430 (1981). Plaintiff did not prove this element with respect to any of the promotions listed on her promotion log.

Wal-Mart does not make promotions or transfers on the basis of straight seniority as plaintiff seems to expect. Promotions are made on the basis of the employee's proven ability in that employee's present job, the employee's enthusiasm for the job, and willingness to give the extra effort. While plaintiff may have been performing satisfactorily in her position in the Receiving Department, more was required before she was considered "qualified" for a promotion. Her demonstrated performance in that job did not establish that she had put forth the "more" which was required.

11. Plaintiff did not establish a *prima facie* case of disparate treatment because she was not qualified for a promotion. However, even assuming that plaintiff had established a *prima facie*

case, defendant articulated legitimate business reasons for the promotions it made listed on plaintiff's promotion log. Plaintiff did not prove that these reasons were pretextual.

12. Plaintiff did express an interest in an office position. She made this desire known to store management through the open door policy and by expressing an interest on her annual evaluation. However, plaintiff did not demonstrate by her performance in the Receiving Department that she was qualified to tackle any job involving more responsibility, more deadlines, more pressure, and more paperwork. These were all areas in which plaintiff was already having problems. Further, plaintiff did not demonstrate that her qualifications were equal to or greater than any of the employees selected for these promotions to office positions.

13. Defendant articulated legitimate nondiscriminatory reasons for each person who was promoted to an office position. In most cases the employee chosen was qualified for office work by virtue of prior experience at another Wal-Mart or another retailer or a bank. In some cases the employee had gained the experience on the job by serving as backup to the regular office employee by working at night. Plaintiff did not demonstrate that any of the reasons offered for the promotions to office positions were pretextual.

14. Nor has plaintiff met her burden of proving she was constructively discharged.

15. A constructive discharge exists when an employer deliberately renders the employer's working conditions intolerable and thus forces him to quit his job. *Johnson v. Bunny Bread Co.*, 646 F.2d 1250, 1256 (8th Cir.1981). The imposition of the intolerable working conditions must be with the express intent of forcing the employee to resign. *Id.* The court also held that an objective standard should be applied to the employee's state of mind in determining what is intolerable: "An employee may not be unreasonably sensitive to his working environment. A constructive discharge arises only when a reason-

able person would find conditions intolerable." *Id. See also Maney v. Brinkley Municipal Waterworks and Sewer Dept.,* 802 F.2d 1073, *Vaughn v. Pool Offshore Co.,* 683 F.2d 922, 926 (5th Cir.1982) ("The focus, then, in a constructive discharge case is on the reasonable state of mind of the putative discriminatee.") In her posttrial brief, plaintiff identifies her constructive discharge claims as related to her discouragement at not being promoted and harrassment offered to her. This harrassment was Wal-Mart's failure to provide her with help after she returned from vacation in August, 1985 and the move of her work station to a different area in the receiving department. Plaintiff testified another reason for her resignation was the fact that she was not able to advance at Wal-Mart and thought that she had no future there. Plaintiff actually went so far as to blame her check-kiting activity on Wal-Mart. When asked to provide an explanation for this activity, plaintiff testified: "That was one of the reasons why that I knew that I had to get away from Wal-Mart because it had me engaging in things that I didn't really understand myself."

The discussion in *Irving v. Dubuque Packing,* 689 F.2d 170 (10th Cir.1982) details what does not constitute constructive discharge:

> The cases applying the doctrine of constructive discharge have held that failure to promote, in and of itself is not sufficient to result in a constructive discharge. (citations omitted.) Nor does an unlawful transfer, in and of itself, constitute a constructive discharge. (citation omitted.) Unequal pay standing alone does not amount to a constructive discharge. (citation omitted.) Finally, casual and intermittent racial slurs do not always give rise to a constructive discharge, *Johnson v. Bunny Bread, supra* [646 F.2d 1250], "Although scarcely uniform, that case law does indicate a general reluctance to predicate a finding of construction discharge upon the *fact* of discrimination. (citation omitted.)
> Further, certain cases have held that a combination of some of these factors does not constitute constructive dis-

charge. For example, in *Muller v. United States Steel Corp., supra* [509 F.2d 923], a company's unlawful failure to promote in combination with a transfer to a position where promotions would be difficult, did not amount to constructive discharge. See also: Annot. 55 ALR Fed 418 Section 6(b). "As these cases make clear, a finding that Clark was constructively discharged must be justified by the existence of certain 'aggravating factors.'" (citation omitted.)

*Id.* at 172–73.

■ 16. The burden of proof for constructive discharge is great and plaintiff did not overcome the presumption that her resignation was voluntary. There was testimony presented which indicated that Jim Harris used racial slurs on occasion. The Court in no way condones this behavior, and the defendant should not either. However, as indicated in *Irving, supra,* casual and intermittent racial slurs do not always give rise to a constructive discharge. Furthermore, it is evident that this had no effect on the way plaintiff was treated while she was employed by defendant. Plaintiff was accommodated in scheduling, she was not subjected to racial harrassment, and the conditions imposed on her were the same as those imposed on other employees in the same position. She continued to receive pay increases which placed her salary at a level commensurate with what would be expected had she remained in the CSM position. The stress and tension plaintiff said she experienced is not to be blamed on Wal-Mart. Her excessive cashing of checks and depositing of cash is at least partial evidence of some sort that she was undergoing external pressures not known to the Court. She was taking advantage of her employer at the time she was using Wal-Mart to float her checks and was not giving her all to her job at that time.

17. Based upon the foregoing, the Court finds that plaintiff has failed to meet her burden of proving discrimination by the defendant, and therefore finds in favor of

72

the defendant. A judgment will be entered in accordance with these findings.