**EQUAL EMPLOYMENT OPPORTUNI-
TY COMMISSION, Appellant,**

v.

**METAL SERVICE COMPANY.**

**No. 89–3322**

United States Court of Appeals,
Third Circuit.

Argued .Oct. 19, 1989.

Decided Jan. 3, 1990.

---

See also, D.C., 706 F.Supp. 401.

Carolyn L. Wheeler (argued), Charles A. Shanor, Lorraine C. Davis, Gwendolyn Young Reams, E.E.O.C., Office of the Gen. Counsel, Washington, D.C., for appellant.

Henry M. Wick, Jr. (argued), Charles J. Streiff, Wick, Streiff, Meyer, Metz & O'Boyle, Pittsburgh, Pa., for appellee.

Before BECKER, COWEN and SEITZ Circuit Judges.

## OPINION OF THE COURT

COWEN, Circuit Judge.

The appellant, the Equal Employment Opportunity Commission ("EEOC"), appeals from the district court's grant of a motion to dismiss against one of the charging parties, Steven Brown, and a judgment entered against the other, Willie Brown, in its suit alleging racial discrimination in the hiring practices of the appellee, Metal Service Company ("Metal Service"), in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a) (1982). The district court held that the EEOC had failed to make out a prima facie case of racial discrimination because it failed to prove by a preponderance of the evidence that the charging parties had applied for employment with the company. Because we find that the EEOC has made out its prima facie case, we will reverse the judgments in favor of Metal Service and remand for further proceedings in the district court.

### I.

The facts of this case are not complex. Metal Service is a small Pennsylvania corporation doing business in Apollo, Pennsylvania. The company's principal activity is the cleaning and painting of structural steel. Between 1984 and 1986, the workforce of Metal Service was all white.

In 1983, Metal Service entered into an oral agreement with the Pennsylvania Job Service ("Job Service") agency under which Job Service referred employment applicants to the company as needed. Job Service is a state agency which functions basically as a labor exchange where qualified persons looking for work are matched with job openings listed by employers. The type of contract entered into by Metal Service and the employment agency was a total placement agreement which required both that the company do all its hiring through Job Service and that the agency keep all the employment applications for the company.

Pursuant to the agreement, Metal Service posted a Job Service decal on its office door referring job applicants to the Job Service office in nearby Vandergrift, PA. The company also posted its own handwritten sign on the door advising job seekers that no employment applications were being accepted directly by the company. The

Job Service decal was removed by a Job Service employee sometime in 1985 when it was discovered that Metal Service had been hiring employees outside the agency's referral system. However, the decal was later replaced in early 1986 after the company and Job Service came to a new understanding. Except for occasional periods when the office door was being painted, Metal Service's handwritten sign remained in place through 1987.

In its case-in-chief, the EEOC put in evidence to show that both Willie and Steven Brown, who are black brothers living near the company, attempted to apply for a job with the company in 1984. Steven Brown testified that he went to Metal Service around May or June of 1984, but found the above-described sign on the company's office door. He then went to Job Service to apply for employment at the company. He testified that at Job Service he filled out an employment card indicating his desire for a job at Metal Service. In addition, Steven Brown stated that he periodically returned to Job Service to check on his application. Steven Brown was never called for a job interview at the company.

Likewise, Willie Brown testified that he applied for a job at Metal Service in the summer of 1984 and was given an application form to fill out by a secretary in the company's office. Willie Brown told the court that the company's application consisted of a one page form containing questions on both sides, one of which asked for the race of the applicant. After not hearing from the company, Willie Brown testified that he returned to Metal Service several months later and was then told that he must apply for employment at Job Service. Around November, 1984, Willie Brown went to Job Service and filled out an employment card indicating that he also desired a job with Metal Service.

In addition, Willie Brown stated that he made several other attempts in 1985 to obtain employment with the company directly. His first attempt was after he read an article in the newspaper that the company had received a large loan to expand its steel operations, and the second was after he heard that a white worker had recently been hired by the company. Each time he was told that Metal Service does not hire directly and that he must apply through Job Service.[1] Willie Brown was never called for a job interview with the company.

In its case-in-chief, the EEOC also presented the testimony of seven present or former white employees of Metal Service, six of whom testified that they got their jobs with the company through word-of-mouth hiring.[2] These six employees had applied for a job directly with the company and not through Job Service. These word-of-mouth hirings occurred between May, 1984, and June, 1985.

At the close of the EEOC's case, Metal Service moved for a directed verdict[3] as to both Steven and Willie Brown on the basis that the EEOC had not presented any evidence that Job Service had referred their applications to the company. The company argued that since Metal Service had not received their applications from Job Service, the company could not have discriminated against the Brown brothers in its hiring decisions.

The district court agreed as to Steven Brown and granted the company a directed verdict. App. at 257, 264. But with regard to Willie Brown, the court reserved judg-

---

1. Willie Brown's subsequent attempts at employment with Metal Service are potentially very significant since there is testimony in the record—albeit somewhat unclear—that the contract between Metal Service and the employment agency was void during 1985 and, therefore, Job Service was *not* hiring for the company at all during this period. *See* App. at 231.

2. The six employees were referred to Metal Service by relatives, friends or neighbors who already worked at Metal Service.

3. Although all parties refer to this motion as a motion for a directed verdict, its proper name is a motion to dismiss under Fed.R.Civ.P. 41(b). *See Lentino v. Fringe Employee Plans, Inc.*, 611 F.2d 474, 476 (3d Cir.1979). For simplicity we will use the former term throughout this Opinion.

ment on the issue because of evidence in the record that Willie had filled out an application for employment directly with the company. At that point in the trial, the district court instructed Metal Service to place into evidence any information it had relevant to the question of whether Willie Brown actually applied for a job directly with the company. App. at 264–65.

Thereafter, Metal Service called as a witness Sheila Martin, the general manager in charge of hiring at Metal Service, who testified that, while the company's application form had changed slightly over the years, during 1984–85 it was indeed one page, with questions on both sides, but that it did not ask the applicant to state his race. In addition, none of the company's application forms already in evidence in connection with the white word-of-mouth applicants contained a question as to the applicant's race. Sheila Martin also stated that the company retains employment applications from June, 1983, the date on which the company first moved to Apollo, and that her search of those records did not uncover an application from Willie Brown.[4]

After Sheila Martin's testimony, the district court granted judgment in favor of Metal Service as to Willie Brown's claim:

> There is no evidence in my opinion that the defendant ever knew of Willie Brown ... except for his testimony that he filed an application some time in 1984.... In addition to being unsure about the date, he seemed to be convinced that the application that he filled out at Metal Service required him to state his race. There is nothing in the way of evidence here that the defendant company ever used an application that required that answer....
>
> [O]n the issue of credibility, I can't find ... by a preponderance of the evidence ... that he filed an application.
>
> ....
>
> And apparently this unemployment office in Vandergrift had an application for both of these men, but they frankly state that they have never referred these ap-

plications to Metal Service. So Metal Service didn't know of [Steven and Willie Brown] and hardly could be accused of race discrimination when they didn't know about the applications.

App. at 286–87, 288–89. This appeal followed. We have jurisdiction pursuant to 42 U.S.C. § 2000e–5(j) (1982) and 28 U.S.C. § 1291 (1982).

## II.

A preliminary issue to be decided in the case is this Court's scope of review on appeal. The parties disagree. The appellant argues we should conduct a plenary review to determine whether it has established a prima facie case of discrimination under Title VII; the appellee counters that the district court's ultimate findings are subject to the clearly erroneous standard of Fed.R.Civ.P. 52(a).

■ It is clear that a district court's finding of discriminatory intent in an action brought under Title VII is a factual finding that may be overturned on appeal only if it is clearly erroneous. *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985); *Bellissimo v. Westinghouse Elec. Corp.*, 764 F.2d 175, 179 (3d Cir.1985), *cert. denied*, 475 U.S. 1035, 106 S.Ct. 1244, 89 L.Ed.2d 353 (1986). *Cf. Pullman–Standard v. Swint*, 456 U.S. 273, 287–88, 102 S.Ct. 1781, 1789–90, 72 L.Ed.2d 66 (1982). However, our review of a district court's analysis of whether the evidence presented is sufficient to establish a prima facie case of disparate treatment under Title VII—as opposed to the ultimate finding of intentional discrimination—is plenary because it necessarily implicates the application of a legal standard to historical facts. *See Green v. USX Corp.*, 843 F.2d 1511, 1526 n. 12 (3d Cir.1988), *vacated on other grounds*, —— U.S. ——, 109 S.Ct. 3151, 104 L.Ed.2d 1015 (1989); *Bryant v. International Schools Services, Inc.*, 675 F.2d 562, 571 (3d Cir.1982). *Accord Gay v. Waiters' and Dairy Lunchmen's Union*, 694 F.2d

---

**4.** We note that this testimony was inconsistent with her letter of February 14, 1986 to the EEOC which stated that Metal Service "did not keep applications for longer than 2 years." App. at 295. The trial was in March, 1989.

531, 545–46 (9th Cir.1982) (arguing that de novo review is appropriate because the prima facie showing is not equivalent to a factual finding of discrimination); Nelson, *The Standard of Appellate Review in Title VII Disparate–Treatment Actions*, 50 U.Chi.L.Rev. 1481, 1492 (1983). *See generally Swint*, 456 U.S. at 289 & n. 19, 102 S.Ct. at 1790 & n. 19 (mixed questions of law and fact "in some cases may allow an appellate court to review the facts to see if they satisfy some legal concept of discriminatory intent"). Thus, the scope of our review is dependent on whether the court below reached the ultimate question of discrimination in this case.

From an examination of the record there is little doubt that the district court directed a verdict against Steven Brown and entered a judgment against Willie Brown because the court found that the EEOC had not established its prima facie case.[5] The question of whether Metal Service had a discriminatory intent was expressly not reached by the court:

> Under the *McDonnell–Douglas* standard we haven't even approached the question of discrimination here. We haven't had any reason to get to the reason the people were not hired and then the shift in burden to show that the reason was a pretext. And here we don't even have evidence that is sufficiently hard and sufficient to show by a preponderance of the evidence that these men really applied.... I cannot very well hold that there was race discrimination when I am not certain, and there is no real evidence, that the people actually applied, when they applied, what they applied for, and what reasons were given for their non-employment.

App. at 287–88. Thus, the issue we must decide, after an independent inquiry, is whether the EEOC has established its prima facie case of unlawful discrimination in violation of Title VII.

---

5. This conclusion logically follows from the district court's grant of Metal Service's motion to dismiss under Rule 41(b) as to Steven Brown. Our review of such a decision when based on a conclusion of law is plenary. *See Miller v. Fairchild Indus., Inc.*, 876 F.2d 718, 723 (9th Cir.

## III.

Title VII of the Civil Rights Act of 1964 reads in relevant part:

> (a) It shall be an unlawful employment practice for an employer—
>
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
>
> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely effect his status as an employee, because of such individual's race, color, religion, sex or national origin.

42 U.S.C. § 2000e–2(a) (1982). A violation of Title VII can be shown in two separate and distinct ways. *See* Nelson, *supra*, at 1482. *See generally Watson v. Fort Worth Bank and Trust*, 487 U.S. 977, 108 S.Ct. 2777, 2784–85, 101 L.Ed.2d 827 (1988). First, a Title VII plaintiff can utilize the disparate impact theory of discrimination. A disparate impact violation is made out when an employer is shown to have used a specific employment practice, neutral on its face but causing a substantial adverse impact on a protected group, and which cannot be justified as serving a legitimate business goal of the employer. *See Wards Cove Packing Co., Inc. v. Atonio*, — U.S. ——, 109 S.Ct. 2115, 2119, 2125–27, 104 L.Ed.2d 733 (1989) (like the analytical proof structure under the disparate treatment theory, the burden of showing disparate impact always remains with the plaintiff and the employer has only the burden of production, on the issue of business justification, once a prima facie case has been established). No proof of intentional dis-

---

1989); *Furth v. Inc. Publishing Corp.*, 823 F.2d 1178, 1179–80 (7th Cir.1987); 9 C. Wright & A. Miller, Federal Practice and Procedure § 2376, at 248 (1972). *Cf. Lentino*, 611 F.2d at 480–82. *But cf. Martin v. E.I. duPont de Nemours & Co., Inc.*, 281 F.2d 801, 803 (3d Cir.1960).

crimination is necessary. *See Watson,* 108 S.Ct. at 2784–85.

Alternatively, the Title VII plaintiff can argue a disparate treatment theory of discrimination. This is the theory advanced by the EEOC in the instant case. A disparate treatment violation is made out when an individual of a protected group is shown to have been singled out and treated less favorably than others similarly situated on the basis of an impermissible criterion under Title VII. *See, e.g., International Bhd. of Teamsters v. United States,* 431 U.S. 324, 335–36 n. 15, 97 S.Ct. 1843, 1854–55 n. 15, 52 L.Ed.2d 396 (1977). Unlike the disparate impact theory, proof of the employer's discriminatory motive is critical under this analysis. *Id.* Discriminatory intent can either be shown by direct evidence, *see, e.g., Slack v. Havens,* 7 Fair Empl.Prac.Cas. (BNA) 885 (S.D.Cal.1973), *aff'd as modified,* 522 F.2d 1091 (9th Cir. 1975), or through indirect or circumstantial evidence. *See, e.g., McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

■ If discriminatory intent is shown indirectly, the burden of production can be shifted to the employer once the plaintiff establishes a prima facie case of discrimination. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824.[6] The employer's burden is to articulate a legitimate, nondiscriminatory reason for the adverse action. However, the ultimate burden of persuasion on the issue of intent remains with the Title VII plaintiff. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981).

In the seminal case of *McDonnell Douglas,* the Supreme Court set forth the by now quite familiar four-prong test for what constitutes a prima facie case.[7] However, the Court cautioned that the "facts necessarily will vary in Title VII cases, and the specification ... of the prima facie proof required from [the complainant] is not necessarily applicable in every respect to differing factual situations." *McDonnell Douglas,* 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13. Since *McDonnell Douglas,* the Supreme Court has held consistently that the *McDonnell Douglas* test forms one model of a prima facie case, not an invariable scheme. *See Teamsters,* 431 U.S. at 358, 97 S.Ct. at 1866 (the Court noted that it was improper for the defendants to argue that the *McDonnell Douglas* pattern was the only means whereby the plaintiff could establish a prima facie case because "[o]ur decision in that case ... did not purport to create an inflexible formulation"); *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949–50, 57 L.Ed.2d 957 (1978) ("[t]he method suggested in *McDonnell Douglas* for pursuing [the disparate treatment] inquiry ... was never intended to be rigid, mechanized, or ritualistic").

This Court has noted similarly that the *McDonnell Douglas* prima facie test should not be viewed as a rigid formula. *See Green,* 843 F.2d at 1526; *Bryant,* 675 F.2d at 575; *Jackson v. U.S. Steel Corp.,* 624 F.2d 436, 440 (3d Cir.1980); *Kunda v. Muhlenberg College,* 621 F.2d 532, 542 (3d Cir.1980) ("of necessity this cannot be an inflexible rule"). *Cf. Fowle v. C & C Cola,* 868 F.2d 59, 68 (3d Cir.1989) (dictum). Indeed, in *Jackson* we specifically held that the elements enumerated in *McDonnell Douglas* "need not be present in every Title VII case." *Jackson,* 624 F.2d at 440.

---

**6.** For a Title VII plaintiff, the prima facie case is usually an indispensable feature because "it addresses two problems that exist in most employment discrimination cases: (1) direct evidence of discrimination is likely to be unavailable, and (2) the employer has the best access to the reasons that prompted him to fire, reject, discipline or refuse to promote the complainant." *Loeb v. Textron, Inc.,* 600 F.2d 1003, 1014 (1st Cir.1979).

**7.** The *McDonnell Douglas* test is the following:

(i) that [the complainant] belongs to a racial minority; (ii) that [the complainant] applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite [the complainant's] qualifications, [the complainant] was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

*McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824 (footnote omitted).

■ Thus, since "[t]he importance of *McDonnell Douglas* lies, not in its specification of the discrete elements of proof there required, but in its recognition of the general principle that any Title VII plaintiff must carry the initial burden of offering evidence adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the Act," *Teamsters*, 431 U.S. at 358, 97 S.Ct. at 1866, courts need not, and should not, stubbornly analyze all Title VII factual scenarios through the *McDonnell Douglas* formula. *Lowe v. City of Monrovia*, 775 F.2d 998, 1006–07 (9th Cir.1985); *Lams v. General Waterworks Corp.*, 766 F.2d 386, 391 (8th Cir.1985); *Nanty v. Barrows Co.*, 660 F.2d 1327, 1331 (9th Cir. 1981); *Grant v. Bethlehem Steel Corp.*, 635 F.2d 1007, 1014 (2d Cir.1980), *cert. denied*, 452 U.S. 940, 101 S.Ct. 3083, 69 L.Ed.2d 954 (1981); *Rodgers v. Peninsular Steel Co.*, 542 F.Supp. 1215, 1219–20 (N.D. Ohio 1982). Instead, courts must be sensitive to the myriad of ways such an inference can be created. Simply stated, a Title VII plaintiff has established a prima facie case when sufficient evidence is offered such that the court can infer that if the employer's actions remain unexplained, it is more likely than not that such actions were based on impermissible reasons. *See Furnco*, 438 U.S. at 576, 98 S.Ct. at 2949; *Gay*, 694 F.2d at 538; *Jackson*, 624 F.2d at 440.

■ With this principle as our touchstone, we believe the EEOC has established a prima facie case of discrimination under Title VII. Courts have generally held that the failure to formally apply for a job opening will not bar a Title VII plaintiff from establishing a prima facie claim of discriminatory hiring, as long as the plaintiff made every reasonable attempt to convey his interest in the job to the employer. This is true both in failure to promote cases, *see Holsey v. Armour & Co.*, 743 F.2d 199, 208–09 (4th Cir.1984), *cert. denied*, 470 U.S. 1028, 105 S.Ct. 1395, 84 L.Ed.2d 784 (1985) (where employee was never asked to fill out an application, the employer had no blacks in sales positions, and had actively discouraged black applicants, casual inquiry into the possibility of promotion to a sales job sufficient for application); *Paxton v. Union Nat'l Bank*, 688 F.2d 552, 568 (8th Cir.1982), *cert. denied*, 460 U.S. 1083, 103 S.Ct. 1772, 76 L.Ed.2d 345 (1983) (where vacancy not posted and plaintiff did not hear about it from any other source until the position was filled, expression of a general desire to advance in bank was sufficient for application); *Abrams v. Baylor College of Medicine*, 581 F.Supp. 1570, 1579 (S.D.Tex.1984), *aff'd in part and rev'd in part on other grounds*, 805 F.2d 528 (5th Cir.1986) (where interest in participating in career advancing program was not communicated by formal application but spread through word-of-mouth, plaintiff's informal communication to his supervisors of his desire to participate is enough for the prima facie case); *Ferguson v. E.I. duPont de Nemours and Co., Inc.*, 560 F.Supp. 1172, 1192–93 (D.Del.1983) (where job vacancies not posted or advertised, plaintiff's "generalized expression of interest [to supervisor] can be considered an application" even though communicated interest was actually for another position); *cf. Box v. A & P Tea Co.*, 772 F.2d 1372, 1376–77 (7th Cir.1985), *cert. denied*, 478 U.S. 1010, 106 S.Ct. 3311, 92 L.Ed.2d 724 (1986) (where employer had no system to ensure all interested applicants could apply, no formal applications were sought and job openings were not posted, "the plaintiff can establish the application element of the prima facie case by showing that, had she known of ... [the] opening, she would have applied"), and in failure to hire cases. *See Furnco*, 438 U.S. at 576, 98 S.Ct. at 2949 (plaintiffs established their prima facie case when they showed, inter alia, that "they did everything within their power to apply for employment"); *Lowe*, 775 F.2d at 1002–03, 1005–06; *Grant*, 635 F.2d at 1017 (where plaintiffs generally made their interest in foremen jobs known, court did not require them to reapply every time a new construction job came up or at precisely the exact time when the superintendents were considering hiring for the job); *cf. Harris v. Birmingham Bd. of Educ.*, 712 F.2d 1377, 1383 (11th Cir.1983) (the fact that the

school system failed to post coaching vacancies, lacked objective standards in hiring and used unstructured principal evaluations contributed to the establishment of plaintiff's prima facie case even though he did not formally apply for particular coaching job in question).

■ The Brown brothers did everything reasonably possible to make known to Metal Service their interest in applying for a job.[8] The evidence is undisputed that both brothers went to Metal Service's office and tried to apply for employment directly with the company. When informed of the company's hiring process, they promptly applied through Job Service. Both brothers specifically expressed an interest in working for Metal Service on the Job Service application form. They periodically checked on their applications. In Willie Brown's case, he went back several times to Metal Service to try to apply directly to the company when he reasonably believed, through newspaper accounts or rumor, that the company was hiring. Indeed, they followed precisely the procedure established by Metal Service for how a person applies for a job at the company. We find that such reasonable efforts are sufficient under the circumstances of this case to satisfy any application requirement necessary for establishing a prima facie case.[9]

A relaxation of the application element of the prima facie case is especially appropriate when the hiring process itself, rather than just the decision-making behind the process, is implicated in the discrimination claim or is otherwise suspect. In *Roberts v. Gadsden Memorial Hosp.*, 835 F.2d 793 (11th Cir.1988), a black hospital employee brought a Title VII disparate treatment action against his employer for denying him fair promotional opportunities on the basis of his race. The claim stemmed from the fact that a white man had been hired for a supervisor position through an informal and secretive hiring process through which the plaintiff did not have the oppor-

---

8. We assume for purposes of our analysis that the district court's finding that Willie Brown did not directly apply to Metal Service is not clearly erroneous.

9. We find the Ninth Circuit's opinion in *Lowe* particularly instructive for our case. In *Lowe,* the city employer established a fairly complex hiring process for its entry level police officer positions. A recent graduate of a police training program could file an application for employment with the city and, after passing the city's written and oral examination, would be placed on an eligibility list according to the applicant's scores. *Lowe,* 775 F.2d at 1002–03. The city accepted applications at all times even though there were no available job vacancies at the time of the application. However, there was a considerable time lag from when an applicant passed the city's examination and was placed on the eligibility list to when the list became effective, i.e., the date on which the city would consult the list and hire from it. *Id.* at 1002. In addition, the eligibility list was effective for only six months. *Id.*

It was undisputed that the city, which had an all-white, all-male police force, hired white male police officers after plaintiff, a black female, had filed her initial application, after she had taken the city's examination but before the eligibility list had become effective, and after the eligibility list had expired. *Id.* at 1002, 1006. But because there were admittedly no openings during the time the eligibility list containing the plaintiff's name was officially effective, the city argued that the plaintiff had not applied for a vacant job and thus had not established her prima facie case. The city contended that it could not discriminate against someone it had not even considered for the job. *Id.* at 1005. The district court agreed and granted the city's motion for summary judgment. The Ninth Circuit reversed. In rejecting the city's argument, the appellate court held that the plaintiff had satisfied her prima facie case because she had applied, for purposes of Title VII, when she filed her initial application and such application extended beyond the city's self-imposed six month effectiveness date. *Id.* The court explained that any legitimate reason the city had for delaying the effective date of the eligibility list or for why the list automatically expired after six months might undermine the presumption of discrimination raised by the prima facie case, but was *not relevant* to the prima facie stage of proof. *Id.* Likewise, we find that under the circumstances of this case Steven and Willie Brown applied, for purposes of the EEOC's prima facie case, at the time they satisfied Metal Service's application process and filed their applications with Job Service. Any reason Metal Service has for why the referral system it established with Job Service did not function as planned and/or why the company was hiring white applicants outside this referral system instead of seeking applicants from Job Service as required by its contract may help to rebut the presumption of discrimination arising from the EEOC's prima facie case, but does not rebut the EEOC's establishment of the prima facie case itself.

tunity to apply. *Id.* at 797. Although the plaintiff was qualified for the position, the white worker landed the job primarily, it seems, because of his attendance at the hospital administrator's barbecues and his becoming the administrator's "drinking buddy." *Id.*

The court noted that informal, secretive and subjective hiring practices are suspect because they tend to facilitate the consideration of impermissible criteria:

> [The Administrator's] informal methods necessarily and intentionally favored those who moved within his social circles —i.e., white people.... [A] black man stood little chance of getting this promotion. This "method" of promotion patently failed to afford a black man the equal treatment which Title VII demands.

*Id.* at 798–99. Thus, the court held that "when the failure to promote arises out of an informal, secretive selection process ... a plaintiff may raise an inference of intentional, racially-disparate treatment without proving that he technically applied for ... the promotion." *Id.* at 797. *Accord Easley v. Empire Inc.,* 757 F.2d 923, 930 n. 7 (8th Cir.1985) (dictum) ("formal application for a job will be excused when a known discriminatory policy ... deters potential jobseekers"); *Carmichael v. Birmingham Saw Works,* 738 F.2d 1126, 1133 (11th Cir. 1984) (where employer failed to use formal process for posting vacancies and for determining who would be considered for the job, and instead relied on word-of-mouth and informal review procedures, employer had the duty to consider all employees "who might reasonably be interested"); *Rodgers,* 542 F.Supp. at 1220 (where employer fails to notify its own employees of vacancy and instead goes outside the company to hire a white worker, qualified black employee has a prima facie case of discriminatory hiring on the basis of race). *Cf. Teamsters,* 431 U.S. at 371, 97 S.Ct. at 1872–73 (after the government has proven a pattern and practice of discriminatory hiring and promotion, nonapplicants may still obtain relief if they can show that they would have applied but for the company's established policy of discrimination); *Cox v. American Cast Iron Pipe Co.,* 784 F.2d 1546, 1551–52, 1560 (11th Cir.), *cert. denied,* 479 U.S. 883, 107 S.Ct. 274, 93 L.Ed.2d 250 (1986) (nonapplicants not foreclosed from proving prima facie case where employer used word-of-mouth hiring practices to maintain sexually segregated workforce).

■ The same concerns are present in the instant case. Alongside its formal Job Service application process, Metal Service maintained a word-of-mouth hiring practice among its existing employees. Such an informal hiring process, in conjunction with an all white workforce, is itself strong circumstantial evidence of discrimination. *Cf. Grant,* 635 F.2d at 1017. Several courts have held that word-of-mouth hiring practices that carry forward racial imbalances are discriminatory. *See Barnett v. W.T. Grant Co.,* 518 F.2d 543, 549 (4th Cir.1975); *Parham v. Southwestern Bell Tel. Co.,* 433 F.2d 421, 426–27 (8th Cir.1970); *Stamps v. Detroit Edison Co.,* 365 F.Supp. 87, 117 (E.D.Mich.1973), *rev'd on other grounds sub nom. EEOC v. Detroit Edison Co.,* 515 F.2d 301 (6th Cir.1975). *Cf. Lams,* 766 F.2d at 392 ("Reliance on ... word-of-mouth recruitment, especially in a segregated workforce, easily may result in discriminatory personnel decisions"). This Court has held that word-of-mouth hiring which results in a relatively small number of minority applicants is circumstantial evidence which helps to establish a reasonable inference of an employer's discriminatory treatment of blacks as a class. *United States v. International Union of Elevator Constructors, Local Union No. 5,* 538 F.2d 1012, 1016 (3d Cir.1976). As the *Parham* court explained, the effects of such a word-of-mouth hiring process are patent:

> [T]he Company's recruitment policy, ... which depended primarily upon existing employees to refer new prospects for employment, operated to discriminate against blacks.... With an almost completely white work force, it is hardly surprising that such a system of recruitment produced few, if any, black applicants. As might be expected, existing white employees tended to recommend their own relatives, friends and neighbors, who would likely be of the same race.

*Parham,* 433 F.2d at 426–27 (footnote omitted). *See also* B. Schlei & P. Grossman, Employment Discrimination Law 446–48 (1976). From the evidence so far produced at trial, the same disturbing results seem to have followed from Metal Service's word-of-mouth hiring practices, at least during the period that Steven and Willie Brown were trying to obtain employment at the company.[10] We believe the existence of such hiring practices bolsters the EEOC's prima facie case and, thus, contributes to the inference that Metal Service engaged in discriminatory treatment of the Brown brothers. *Cf., Lams,* 766 F.2d at 391 (evidence of systemic discriminatory recruitment practices is relevant to individual disparate treatment claims).

In addition, we find that because of Metal Service's own informal hiring process, the exact positions that became vacant during the relevant periods, and the qualifications required for those positions, are not readily ascertainable. *Cf. Rodgers,* 542 F.Supp. at 1220 n. 2. However, by examining the record and the jobs actually performed by the white applicants hired during this period, it is clear to us that there were at least several job vacancies at Metal Service which did not require special skills and for which the Brown brothers may have been qualified.

For example, three employees were hired to do metal grinding work at Metal Service. This job was described by Metal Service's general manager, Sheila Martin, as "basically not difficult," and required only "concentration." App. at 254. Of the three hired employees, only William Baylor had any prior job experience involving grinding work, although even his experience was with a different and much larger machine than the one used at Metal Service. App. at 188–89. Thomas Heinle had no work experience at all and only limited school experience using a much smaller grinding machine. App. at 127–29.[11] John Barr testified that before landing the grinding job at Metal Service his prior work experience consisted of "pumping gas, doing some body work, a little bit of primering, painting." App. at 137. He stated that he learned how to grind metal on the job after a fellow employee helped train him for a couple of weeks. App. at 142.

In addition, Dennis Fouse, who was hired by Metal Service through Job Service in June 1984, initially worked along with a couple of other employees unloading and moving pipe at the company. App. at 192. Metal Service received federal funds to train Fouse through a state job training program initiated by the company. App. at 200–02. In qualifying for the funds, the company listed Fouse's job as a "material handler." App. at 202.[12]

We therefore conclude that the fact that Steven and Willie Brown were required to undergo a burdensome application process while white applicants were being hired for apparently unskilled jobs through word-of-mouth in an all white workforce is sufficient to establish a prima facie case. It must be stressed that in order to secure to all persons the effective protection of Title VII, federal courts simply cannot make the prima facie case unduly burdensome.[13] *See Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093–94; *Whack v. Peabody & Wind Eng'g Co.,* 595 F.2d 190, 193 n. 11 (3d Cir.1979) ("This Court has not been overly demanding in the proof required for a *prima facie* case."). This is

---

10. See the discussion *supra* note 2 and accompanying text.

11. It should also be noted that for all subsequent work assignments that Heinle performed at Metal Service, he received on the job training from the company. App. at 129.

12. Fouse also testified that he later began to do some grinding work as well. App. at 192–93. He stated that there was no real training involved: "I started grinding like right after [a fellow employee] had showed me. He told me what to watch out for. He said if I have any problems just to let him know. But I started grinding then." App. at 193a.

13. Rather, as this Court has explained:
[t]he requirement of the *prima facie* showing was intended as a working tool to provide a means to determine which cases raise sufficiently compelling inferences of discrimination to require rebuttal. It was *not* intended as a hallmark of whether the complainant has *proved* his or her case.
*Green,* 843 F.2d at 1527.

especially true for the application requirement. As the Supreme Court has made clear:

> If an employer should announce his policy of discrimination by a sign reading "Whites Only" on the hiring-office door, his victims would not be limited to the few who ignored the sign and subjected themselves to personal rebuffs. The same message can be communicated to potential applicants more subtly but just as clearly by an employer's actual practices—by his consistent discriminatory treatment of actual applicants, by the manner in which he publicizes vacancies, his recruitment techniques, his responses to casual or tentative inquiries, and even by the racial or ethnic composition of that part of his work force from which he has discriminatorily excluded members of minority groups.

*Teamsters*, 431 U.S. at 365, 97 S.Ct. at 1869–70 (footnote omitted).

We do not hold, of course, that Metal Service has discriminated against Steven and Willie Brown. We simply hold that the EEOC has presented enough circumstantial evidence from which an inference that the Brown brothers were treated less favorably because of their race can be drawn. And, "[i]n our view, the presence of abundant circumstantial evidence from which the inference of discriminatory treatment can be reasonably drawn is sufficient to require that the employer respond, and that its response be closely scrutinized." *Green*, 843 F.2d at 1526–27. Thus, we will remand this case to the district court for further proceedings. At those proceedings, Metal Service will have the burden of producing a legitimate, nondiscriminatory reason for why the Brown brothers were treated less favorably with regard to Metal Service's hiring practices than white applicants during the same period.[14] *See Lams*, 766 F.2d at 393; *Nanty*, 660 F.2d at 1332. The EEOC should also be afforded an adequate opportunity to rebut this reason and show whether it is just a pretext for discrimination. Of course, the burden of persuasion on the discrimination issue will at all times remain with the EEOC. *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093–94.[15]

## IV.

In summary, because we find that the EEOC has established a prima facie case of disparate treatment by Metal Service in its failure to hire both Steven and Willie Brown, we will reverse the judgments in favor of the company as to both individuals, and remand for further proceedings consistent with this Opinion. Costs taxed against the appellee.

---

14. Of course, as to Steven Brown further proceedings are necessary because a directed verdict was wrongfully granted against him. Further proceedings are also necessary with respect to Willie Brown, however, because his trial on the merits was aborted by the district court when it limited Metal Service's required proof to evidence solely on the issue of whether he had ever directly applied to the company.

15. Because of our holding, we do not address the merits of the EEOC's argument that it should have been allowed to call a corroborating witness to testify that Willie Brown filed an application directly with Metal Service, even though it failed to present that witness in its case-in-chief. To the extent that the corroborating witness' testimony was relevant only to the prima facie case, any error has been cured by our opinion today. Of course, we offer no opinion at this point as to whether the witness' testimony may be relevant to the showing of pretext.