Arnold M. WILLIAMS, Plaintiff,

v.

SEVEN SEVENTEEN HB, PHILA-
DELPHIA CORP. NO. 2 t/a Adam's
Mark Hotel and HBE Corporation
d/b/a Adam's Mark Hotels & Resorts,
Defendants.

No. Civ.A. 98–2241.

United States District Court,
E.D. Pennsylvania.

June 25, 1999.

Samuel A. Dion, Philadelphia, PA, for plaintiff.

Denise K. Kontrack, Philadelphia, PA, for defendants.

### MEMORANDUM

LOWELL A. REED, Jr., Senior District Judge.

Plaintiff Arnold M. Williams ("Williams") filed this lawsuit alleging race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a) and 42 U.S.C. § 1981. Williams alleges that he was fired from his job as a bartender at the Adam's Mark Hotel on City Line Avenue in Philadelphia because he is African American.

Presently before the Court is the motion of defendants Seven Seventeen HB Philadelphia Corporation No. 2 t/a Adam's Mark Hotel and Adam's Mark Hotels & Resorts (collectively "defendants" or "Adam's Mark") for summary judgment (Document No. 24) and the response of Williams thereto. Jurisdiction is proper pursuant to 28 U.S.C. § 1331. For the reasons set forth below, the motion will be denied.

### I. BACKGROUND[1]

Williams was employed as a bartender/barback at Adam's Mark beginning De-

1. The following summary is based on the evidence of record viewed in the light most favorable to Williams, the nonmoving party, as required when considering a motion for summary judgment. *See Carnegie Mellon Univ. v. Schwartz*, 105 F.3d 863, 865 (3d Cir.1997).

cember 17, 1991 until his termination on June 24, 1997. Williams first began working for Adam's Mark in 1990, working as a barback. Williams left later that same year to work for another employer. In 1991, Williams returned to the Adam's Mark, working alternately as a barback and bartender. He became a full-time bartender in 1992. During 1995 and 1996, Williams worked primarily as a bartender in Players Sports Bar ("Players") and on weekends at Quincy's. Both bars were located in the Adam's Mark Hotel.

The job evaluations which were part of Mr. Williams' personnel file also reflect an excellent employment record. (Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment ("Plt.Mem."), Exh. B). Each of the reviews indicate above average performance with comments by Williams' supervisors that he was personable, friendly and very good with the hotel guests and customers. (Id.). William's immediate supervisor, Karen Snider, rated his job performance as "above average, if not close to excellent." (Snider Deposition, Plt.Mem., Exh J. at 27). During her deposition, Ms. Snider had no criticism of William's job performance and did not recall any areas where he required improvement. (Id.). The former manager of Quincy's and Players, Brent Stanton, declared that during the entire period that he was employed at the Philadelphia Adam's Mark (from 1995–April 1997), he found Williams to be "an excellent bartender who's honesty was impeccable. I even recommended him for a management position." (Plt.Mem., Exh. A at ¶ 5).

Williams tended bar at Quincy's on the weekends. The clientele at Quincy's on the weekends was largely African–American. (Snider Dep. at 48–49, 76–77). The

hotel guests were largely Caucasian. (Id. at 77). According to Snider, during food and beverage meetings, she and other managers discussed how to attract more white patrons to Players and Quincy's and how to attract fewer African–Americans.[2]

In early May, 1997, defendants hired Dimitri Sarantis as its Food and Beverage Director. Also in the beginning of May, defendants hired John Moser as the new manager for Quincy's. Moser replaced William's former supervisor, Brent Stanton.

Sometime in May, shortly after Sarantis was hired, Sarantis entered Players while Williams was behind the bar. The bar was empty. According to Williams, it appeared that Sarantis was checking out the bar to see if it was clean. (Exhibits in Support of Defendants' Motion for Summary Judgment ("Def.Exh."), Exh. A, Williams Deposition at 65–68). Williams greeted Sarantis and welcomed him "aboard." (Id. at 65–66). Sarantis looked at Williams and said: "You're the reason for the clientele we have in Quincy's."[3] (Id. at 66). Williams responded that he did indeed work at Quincy's on the weekend. According to Williams, he then held out his hand to shake and Sarantis ignored it. (Id.).

Williams' second encounter with Sarantis occurred on June 20 1997. Williams was tending bar at Players that night. According to Sarantis, he was sitting in the lobby outside the bar for no particular reason "watching the world go by." (Def.Exh. D, Sarantis Deposition at 26). Sarantis then saw a former employee, Eugene Suizdak, the ex-manager of Applebees, enter Quincy's. Sarantis became suspicious and went into the bar and ordered a beer. (Id. 27–28). He did not see a check in front of

---

2. Williams makes broad allegations of a plot by "management" to rid the hotel of the weekend African–American clientele at Quincy's. In so doing, Williams relies on statements, among others, purportedly made by the president as well as the owner of Adam's Mark. Because I only rely upon the personal

knowledge of Snider, I need not presently decide the admissibility of such statements.

3. Williams contends that this was a derogatory comment made in reference to the predominantly African–American crowd which regularly patronized Quincy's on the weekend.

Suizdak.[4] (*Id.* 22–23). Soon thereafter, Moser came in and asked Williams if he had a check for the Suizdak. Sarantis then states that Williams thumbed through a number of checks and pick one out. Moser then said that it couldn't be the right check because the time stamp on the check indicated that it had from an hour or two earlier. After thumbing through the checks again, Williams said "oh that's right, I was just going to get it for him" or something to that effect. (*Id.*). Moser told him not to bother.

Snider, however, gives a much different account of the same event. (Plt.Mem., Exh. J, Snider Deposition at 37–42). Snider testified at her deposition that she saw Sarantis sitting out in front of the bar that evening and asked him what he was doing. Sarantis answered that he was watching Williams. Shortly thereafter Sarantis approached Snider and told her that he thought Williams had given Suizdak a free drink. Snider then went and asked Williams if he had a check rung up for Suizdak. Williams held up a check, saying yes, and then put it aside. Satisfied, Snider left the bar. (*Id.*).

Leaving the bar, she ran into Moser and described what had just happened. She and Moser then returned to the bar to ask to actually see the check. The check apparently looked legitimate to Snider. (*Id.* 43–45.). Moser, however, thought the time was incorrect. Snider states that she could not tell one way or the other because she did not know when Suizdak ordered the beer. (*Id.*). In any event, Snider was satisfied that the check was for a draft beer, which is what Suizdak had before him. (*Id.*) (Sarantis also stated that Williams had a check for the wrong type of

beer, i.e., bottled beer which in his mind confirmed that Williams had not rung in the check. (Def.Exh., Sarantis Deposition at 24)). Snider then left to find someone to cover the bar because Sarantis and Moser wanted to send Williams home and discuss it more.

According to Williams, he served Suizdak a draft beer and took his money. Because he was also busy handling orders for a party of twelve that had just come in prior to Suizdak, he did not immediately ring in the check. Shortly thereafter, Sarantis entered. Williams promptly served Sarantis and rang up the check for Sarantis and Suizdak. He then claims that when Moser came in and asked to see the check he showed him the check.

Finally, in an affidavit Suizdak states that he came into the bar that evening, ordered a beer and placed a $20.00 bill on the bar. (Plt.Mem., Exh C at ¶ 3). Williams took the money and began to talk to other customers and take orders for drinks. (*Id.*). After talking to the other customers, Williams brought Suizdak back his change and a check. (*Id.*). Suizdak also states that he did not ask for a free drink that night and paid for every drink he ordered. (*Id.* at ¶ 4).

Having the check would presumably resolve the irreconcilable differences between Williams' account of what happened and the defendants' account. The check itself, however, has never been produced.

After being asked to produce the check, Williams was told to leave and report back to Human Resources on Monday, June 23. On Monday, Williams called Human Resources and told his version of the events

---

4. Defendants assert that it is a well established hotel policy known to all bartenders that after serving a patron a beverage, the bartender must ask if the patron wants to run a tab, have the charge placed upon their hotel bill or settle the check at that time. In each instance, the transaction must result in a rung check for the beverage served. The bartender is then required to place the check (until settled) in front of the customer. Both Play-

ers and Quincy's have ABC (Automatic Beverage Control) registers which regulate the controlled automatic liquor dispensing system. Under the ABC register system, for all alcoholic beverages other than wine and beer, the bartender would have to ring up the drink on the register before it could be dispensed and served to the customer. This facilitated the hotel policy that everyone served must receive a check.

to the Director of Human Resources. She told him to come in on Tuesday. On Tuesday, Williams was told that he would meet with Sarantis. According the Williams, Sarantis wanted him to sign a termination form for failing to ring up a check for a drink.[5] Williams protested saying that Sarantis had seen him ring up the check. Sarantis allegedly said that he had seen Williams ring it up, but that Williams only rang it up because Sarantis showed up. Sarantis told Williams if he signed the termination, Williams would get his "vacation check and everything." (Williams Deposition, Def.Exh. A at 97–99). Williams did not sign and was terminated.

## II. LEGAL STANDARD FOR SUMMARY JUDGMENT

Defendants have moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. Under Federal Rule of Civil Procedure 56(c), summary judgment may be granted when, "after considering the record evidence in the light most favorable to the nonmoving party, no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." *Turner v. Schering–Plough Corp.,* 901 F.2d 335, 340 (3d Cir. 1990). For a dispute to be "genuine," the evidence must be such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the moving party establishes the absence of a genuine issue of material fact, the burden shifts to the non-moving party to "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The non-moving party may not rely merely upon bare assertions, conclusory allegations, or suspicions. *Fireman's Ins. Co. of Newark v. DuFresne,* 676 F.2d 965, 969 (3d Cir.1982). A proper motion for summary judgment will not be defeated by merely colorable or insignificantly probative evidence. *See Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505.

## III. DISCUSSION

■ Williams alleges that he was fired because Sarantis attributed a large African–American weekend clientele at Quincy's to Williams because Williams himself is African–American. In so doing, Williams claims that the defendants discriminated against him on account of his race in violation of Title VII of the Civil Rights Act of 1964, ("Title VII"), 42 U.S.C. § 2000e–2(a) and 42 U.S.C. § 1981. Claims of discrimination brought under § 1981 must meet the same burden of proof that is required for claims brought under Title VII. *Patterson v. McLean Credit Union,* 491 U.S. 164, 186, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989). Thus, I will analyze Williams' claim only under Title VII below; however, my analysis and conclusions are equally applicable to his claim under § 1981.

The analysis of Williams claim is governed by the burden shifting paradigm of *McDonnell Douglas* and its progeny. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). To survive summary judgment, Williams must first establish a prima facie case of unlawful discrimination. *Hicks,* 509 U.S. at 505, 113 S.Ct. 2742. This creates a presumption of discrimination. *Id.* at 506, 113 S.Ct. 2742. Once a prima facie case has been established, the defendants must produce some evidence of a legitimate nondiscriminatory business rea-

---

**5.** The Adam's Mark Employee Handbook states that grounds for immediate termination of any and all Adam's Mark employees exists for: "Theft (unauthorized removal) or misappropriation (unauthorized storage, transfer, or utilization) of guest, or hotel property including items found on the hotel premises." (DefExh., G "Standards of Conduct").

son for the employers action. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir.1994). If this evidence is produced, Williams may survive a motion for summary judgment "if the plaintiff produced sufficient evidence to raise a genuine issue of fact as to whether the employer's proffered reasons were not its true reasons for the challenged employment action." *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1066 (3d Cir.1996) (en banc); *Fuentes*, 32 F.3d at 764 (plaintiff can survive summary judgment by pointing to "some evidence, direct or circumstantial, from which a factfinder could reasonable either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action").

### A. Prima Facie Case

■ To establish a prima facie discriminatory discharge case, Williams must show that: (1) he is a member of a protected class; (2) he was qualified for the position; (3) he was discharged from the position; and (4) that non-members of the protected class were treated more favorably or that after his termination, he was replaced by someone not in a protected class. *See McDonnell–Douglas*, 411 U.S. at 802, 93 S.Ct. 1817; *Hicks v. Arthur*, 878 F.Supp. 737, 738 (E.D.Pa.1995). The prima facie case is not intended to be rigidly applied or difficult to show. *E.E.O.C. v. Metal Service Co.*, 892 F.2d 341, 347 (3d Cir. 1990); *Hicks*, 878 F.Supp. at 738. Here, Williams has established a prima facie case: (1) he is a member of a protected class; (2) he was qualified for his position of bartender; (3) he was discharged; and (4) a white male was hired in his place.[6]

### B. Legitimate Nondiscriminatory Reason

Once a prima facie case is made, the burden of production shifts to defendants to assert a legitimate nondiscriminatory business reason for the employer's action. *Fuentes*, 32 F.3d at 763. The employer can satisfy its burden of production "by introducing evidence which, if taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Id.* The burden on the employer is relatively light. *Id.* The employer need not prove that the tendered reason actually motivated its behavior because the ultimate burden of proving intentional discrimination always rests with the plaintiff. *Id.* Here, defendants have articulated a legitimate nondiscriminatory reason for firing Williams, namely that he misappropriated hotel property by providing a "free drink" to a former hotel employee in violation of a well established hotel policy. Sarantis' testimony, if believed, would allow the conclusion that defendants had a valid nondiscriminatory reason for firing Williams.

### C. Pretext

To survive a motion for summary judgment when the employer answers the plaintiff's prima facie case with a legitimate, nondiscriminatory reason for its action, the plaintiff must point to some evidence from which a factfinder could reasonably either disbelieve the proffered reason or believe that an invidious discriminatory reason was more likely than not a motivating factor. *Sheridan*, 100 F.3d at 1067; *Fuentes*, 32 F.3d at 764. In *Sheridan*, the en banc Court of Appeals held that the elements of the prima

---

**6.** Defendants argue that Williams has failed to meet the last prong, arguing that he cannot show that similarly situated employees who are not members of a protected class were not treated more favorably. Specifically, defendant points to evidence that other bartenders, who have violated hotel regulations, have been fired regardless of race. However, for purposes of raising the presumption of discrimination, it suffices that defendants have replaced Williams with someone not in a protected class. *See e.g.*, *Hicks*, 878 F.Supp. at 738.

facie case and the disbelief of the defendant's proffered reasons will permit, but not necessarily require, a jury to draw an inference leading it to conclude that there was intentional discrimination. 100 F.3d at 1066–67. Accordingly, the Court of Appeals explained, it follows that a plaintiff may survive summary judgment if the plaintiff produces sufficient evidence to raise a genuine issue of material fact as to whether the employer's proffered reason was its true reason. *Id.* The Court of Appeals rejected the proposition that the plaintiff is required to point to some evidence that the actual motive of those in the decision making process was discriminatory because the plaintiff " 'need not also come forward with additional evidence of discrimination beyond his or her prima facie case.' " *Id.* at 1071 (quoting *Fuentes,* 32 F.3d at 764). Thus, "[t]he district court must determine whether the plaintiff has cast sufficient doubt upon the employer's proffered reasons to permit a reasonable factfinder to conclude that the reasons are incredible.... But once the court is satisfied that the evidence meets this threshold requirement, it may not pretermit the jury's ability to draw inferences from the testimony, including the inference of intentional discrimination drawn from an unbelievable reason proffered by the employer." *Id.* at 1072.

■ Williams has produced sufficient evidence to raise a genuine issue of material fact as to whether the defendants proffered reason for firing him was the true reason he was fired. Based upon the testimony of Williams and Snider as well as the declaration of Suizdak added to the apparent unavailability of the bar check defendants claim substantiates their decision and which Williams claims substantiates his innocence, a reasonable factfinder could disbelieve the defendants' assertion that Williams was fired for misappropriating hotel property. Indeed, absent the check, if Williams, Suizdak and Snider are to be believed, a reasonable jury could believe that defendants completely fabricated the reason for Williams' dismissal. In sum, I conclude that Williams has produced evidence such that a jury could reasonably infer that the defendants' proffered reasons for their termination of Williams are not worthy of credence. Accordingly, summary judgment is inappropriate.[7]

## IV. CONCLUSION

For the foregoing reasons, the motion will be denied.

---

7. HBE Corporation moves for summary judgment on the additional ground that HBE Corporation was not Williams' employer. HBE does not, however, press this argument in its brief. Nor does Williams respond. Other than the bald assertion by counsel for HBE Corporation, there is no information in the record regarding this issue. This is not a situation where the defendant cannot present evidence of a negative and therefore point to a lack of evidence to which the plaintiff must respond. Because the Court has no information upon which to analyze the HBE Corporation's contention and given the procedural posture of this case, the motion of HBE Corporation for summary judgement on grounds that it is not Williams' employer will be denied.