HEANEY, Circuit Judge,
with whom McMILLIAN, MURPHY, and SMITH, Circuit Judges, join, dissenting.
I respectfully dissent. Lockridge has presented evidence sufficient to raise a genuine issue of material fact on his race discrimination claim. I would therefore affirm the district court’s denial of appellants’ summary judgment motion. The promotion policy at PCCUA, largely supervised by Jones, is ambiguous and potentially discriminatory, and Lockridge deserves a jury trial.
Under the circumstances, Lockridge need not have formally applied for the vacant deanship to have established a pri-ma facie case of racial discrimination. An employee’s failure to apply for a position pursuant to established procedures will normally bar his claim. However, the failure to apply is excused where the employer has no formal application process, where the employee is unaware of the opportunity, see Kehoe v. Anheuser-Busch, Inc., 96 F.3d 1095, 1105 n. 13 (8th Cir.1996), or where the employer’s promotions policy is “informal and subjective” and “vague and secretive.” Lyoch v. Anheuser-Busch Companies, Inc., 139 F.3d 612, 615 (8th Cir.1998). See also EEOC v. Metal Service Co., 892 F.2d 341, 348 (3rd Cir.1990) (“Courts have generally held that the failure to formally apply for a job opening will not bar a Title VII plaintiff from establishing a prima facie claim of discriminatory hiring, as long as the plaintiff made every reasonable attempt to convey his interest in the job to the employer.”); Carmichael v. Birmingham Saw Works, 738 F.2d 1126, 1133 (11th Cir.1984) (“[Djefendant used no formal procedures for posting notice of available promotions or for determining who would be offered the promotion. Instead, the company relied on ‘word of mouth’ and informal review procedures.”).
Another circumstance in which courts need not consider the application requirement is where the employer has failed to establish a clear personnel procedure for promotions. This is direct evidence of discrimination, and the McDonnell Douglas analysis is inapplicable to the matter. Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 121, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985). “The failure to establish ‘fixed or reasonably objective standards and procedures for hiring’ is a discriminatory practice.” Watson v. National Linen Serv., 686 F.2d 877, 881 (11th Cir.1982) (quoting Brown v. Gaston Co. Dyeing Machine Co., 457 F.2d 1377, 1382 (4th Cir.1972)).
In the case before us, the record shows that PCCUA utilized several different procedures for hiring and promotions. It is unclear under what circumstances Jones elected to use each procedure. Lockridge’s attempts at promotion at PCCUA demonstrate the seemingly random and subjective promotions process. For example, in 1988, Lockridge “formally applied” for the position of Director of Continuing Edu *1014 cation. Jones responded to this application by telling Lockridge he would contact him when PCCUA decided to fill the position. In 1992, PCCUA hired Deborah King, a white woman, as Director of Continuing Education. Lockridge alleges that the position was never officially advertised or posted.
In 1988, the college hired Jack McCom-mon, a white man, as Associate Dean of Technical and Industrial Programs. Lock-ridge alleges this position was not posted, and that the person hired was not as qualified as he. At the time, Lockridge had two technical graduate degrees and twelve years of teaching experience. In 1993, Lockridge applied for the same position again and was not interviewed for the job because he lacked the “requisite vision.” Although Steven Murray, Academic Dean of Instruction at the time, stated that the college’s hiring policy was to conduct an internal search for qualified applicants before advertising outside the college, the record does not show whether PCCUA carried out an internal search. Ultimately, John Little, a white male, was recommended for the position, and Jones approved this recommendation.
In 1995, Jones decided to merge the Division of Technical and Industrial Education, where Little was Associate Dean, and the Division of Business and Data Processing, where Linda Killion was Associate Dean, to form the Division of Business and Technology. After having fired Little, Jones eliminated that deanship, and Killion became the Dean of Business and Technology. The record shows that Kil-lion did not file an application for this position or at least two others that she held at the college: department chair and Associate Dean of Business & Data Processing.
Three years later, in 1998, Jones restored the “original dual components” of the divisions described above. Killion was to lead the Division of Business and Computer Technology, and the college was to commence a search for a person to lead the Division of Industrial Technology and Workforce Development. On April 21, 1998, Jones sent an e-mail to the faculty announcing his decision. On April 22, Lockridge asked Killion why she did not recommend him for the open position when she knew he was qualified for the job and when the college policy was to look for qualified internal applicants first before conducting an external search. On May 5, 1998, a mere two weeks after Lockridge was informed of the vacancy, Lockridge discovered that Tracy McGraw, a white man, had been hired for the deanship based on the search committee’s recommendation.
Appellants insist that the hiring process in this instance could not have been more explicit: the administration posted the vacant position announcement on campus, advertised it in state and local newspapers, and e-mailed the announcement to the entire campus community, and Loekridge’s supervisor asked whether he was going to apply for the position. It was not, they assert, a “vague and secretive” process. Nevertheless, the college fails to show what its procedure for hiring and promotions actually is. The record indicates that Jones has the discretion to determine whether a search committee or the appointment process for a vacant position will be utilized.[1] He also has the ultimate authority in hiring decisions.
*1015 In support of the appellants’ position, the majority asserts that university administrators need significant discretion in filling vacancies, and that to expect an institution to have a clear promotions policy would frustrate the hiring process. This line of reasoning only serves to enforce a potentially discriminatory practice of hiring and promotions at PCCUA. Lock-ridge has unsuccessfully sought a promotion to a deanship since 1988. His failure to submit an application for the most recently posted vacancy cannot be considered in isolation, as the majority suggests, nor is it fatal to his claim. Lockridge was given the opportunity to apply, but not the opportunity to be hired from within, free from outside competition, which was an advantage that his supervisors and other similarly qualified colleagues have enjoyed throughout their tenure at PCCUA. Furthermore, there is sufficient evidence to allow a jury to conclude that the practice of hiring new deans from within the PCCUA community changed once Lockridge was the obvious next choice for an internal promotion.
There is no doubt in my mind that Lock-ridge has presented sufficient questions of fact regarding the arbitrary manner in which Jones hired and promoted faculty members. The evidence in the record fails to clarify which positions were announced as vacancies at the college, whether everyone was required to make application for promotions, and what the usual time frame was between the announcement of a vacancy and the deadline for the submission of an application. A reasonable jury could conclude that the subjective manner in which the administration conducted these matters is direct evidence of discriminatory practices, triggering an entirely different analysis than what appellants have presented to this court. See Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 121, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985). I would therefore affirm the district court’s judgment allowing Lockridge’s failure to promote claim on the basis of race to proceed to trial.
Regarding Jones’s qualified immunity claim, the district court correctly held that Jones’s alleged intent to discriminate against Lockridge on the basis of his race, *1016 if proved, would not be an act in good faith as required by Arkansas’s indemnification law. The court also noted that the ambiguity surrounding the policy and practices regarding promotions at the college precluded Jones’s qualified immunity defense. I believe we should affirm this matter as well.
The determination of whether a state actor is entitled to protection of qualified immunity is a two-step process. Saucier v. Katz, 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). The initial question is whether, taken in the light most favorable to Lockridge, the facts alleged show that Jones’s conduct violated a constitutional right. Washington v. Normandy Fire Protection Dist., 272 F.3d 522, 526 (8th Cir.2001). There is no dispute that Lockridge has alleged that Jones violated §§ 1981 and 1983 by failing to promote him to the vacant deanship because of his race.
The next inquiry is whether the right was clearly established. Washington, 272 F.3d at 526 (citation omitted). “To be clearly established, ‘[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.’ ” Id. (quoting Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). This court has broadly considered what constitutes “clearly established law” for the purposes of a qualified immunity inquiry. Sexton v. Martin, 210 F.3d 905, 909 (8th Cir.2000); Boswell v. Sherburne County, 849 F.2d 1117, 1121 (8th Cir.1988).
Section 1983 provides individuals with a civil remedy for the violation of constitutional rights. To establish a § 1983 violation, the plaintiff must show 1) that a person has deprived him of a federal constitutional or statutory right; and 2) that the person acted under color of state law when it deprived the plaintiff of the federal right. Gomez v. Toledo, 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980). Lockridge must show, therefore, that Jones, acting under color of state law, deprived him of a constitutional right. The appellants allege that the complaint is devoid of any allegations of personal acts by Jones that deprived Lockridge of a constitutionally protected right. Jones conceded in his deposition, however, that he has the discretion to determine how a vacant position will be filled, either through a hiring process or by direct appointment. Because PCCUA’s ambiguous promotion policy may be direct evidence of race discrimination, it is possible that Jones’s alleged discretion in such matters is implicated. A reasonable jury could conclude that Jones was personally involved in failing to promote Lockridge because of his race in violation of the Fourteenth Amendment.
If Jones, as a public official, intentionally discriminated against Lockridge on the basis of his race, he violated clearly established law set forth in 42 U.S.C. §§ 1981 and 1983, Title VII, and the Fourteenth Amendment. Therefore, I would affirm the district court’s determination that Jones is not immune to suit in his individual capacity in this matter.
For the reasons cited above, I would affirm the district court’s decision in all respects.

. In deposition, Jones provided the following responses to questions regarding the promotions policy at PCCUA:
Q. [Have you given notice] to the faculty of how vacancies for promotions will be determined? Are there any writings?
A. There's a college policy that discusses the general protocols for filling new posi *1015 tions ... we have to adhere to state regulations on advertisings [sic] and postings and those sorts of issues.
í ti* $ í(í
Q. Now if you choose to, decide to promote someone you have that power don’t you?
A. If a recommendation is made to me for a promotion consideration, I ultimately do make the hiring decision, yes.
Q. And sometimes you make the judgment of whether or not you’re going to promote somebody or create or restructure a section of the department in order to determine some other way for filling a vacancy?
A. Yes, sir; that is my responsibility as CEO.
(Deposition of Dr. Steven W. Jones at 7-8).
Q. So that it is fair to say, isn’t it doctor, that you had a policy of promoting from within?
A. No sir; it's not.
Q. Well, at least you had a policy of promoting people to the position of dean from within did you not?
A. That might be a fair assessment.
(Id. at 22.)
Q. Who was in line had you followed a promotion from within policy? Who was in line to get that other associate dean position based on your staff at that time?
A. Mr. Walker, I don't have a promotion from within policy.
Q. To associate dean you said you did.
A. I don’t have a policy; no, sir.
Q. The practice then. According to your practice who would have been next in line to get that position?
A. Promotions from within have been a practice on occasions, on other occasions they have not been Mr. Walker.
(Id. at 117).